# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TAMESHA MEANS,

        Plaintiff,

vs.

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS, a not-for-profit
corporation, STANLEY URBAN,
ROBERT LADENBURGER, and MARY
MOLLISON,

        Defendants.

_____/

Hon. Robert Holmes Bell

Case No. 15-cv-00353-RHB

**ORAL ARGUMENT REQUESTED**


### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT USCCB'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
### [ORAL ARGUMENT REQUESTED]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

ISSUE PRESENTED ....................................................................................... vi

INTRODUCTION ............................................................................................. 1

FACTS .......................................................................................................... 2

STANDARD OF REVIEW ................................................................................. 3

ARGUMENT .................................................................................................. 9

I.      USCCB Has Waived Its Personal Jurisdiction Defense .................................. 9

II.     This Court Has Specific Jurisdiction Over USCCB Because It Has
        Purposefully Directed Its Activities at Michigan Residents and This
        Litigation Arises Out of Those Activities. ....................................................... 2

    A.  USCCB purposefully availed itself of Michigan as a forum ......................... 3

    B.  This case arises from USCCB's activities directed at Michigan. ................ 19

    C.  The exercise of jurisdiction over USCCB is reasonable. ............................ 21

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*,
  503 F.3d 544 (6th Cir. 2007) ............................................................9, 13

*Am. Greetings Corp. v. Cohn,* 839 F.2d 1164 (6th Cir. 1988) .................................9

*Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102 (1987) ......17

*Bennett v. J.C. Penney*, 603 F. Supp. 1186 (W.D. Mich. 1985)...................... 14, 16

*Bridgewater Music, Inc. v. Still N the Water Pub*, 327 F.3d 472 (2003) ......... 18, 19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...........................................13

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ......................................................19

*Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899 (6th Cir. 2006) ..........................9

*Dean v. Motel 6 Operating LP*, 134 F.3d 1269 (6th Cir. 1998) ...............................9

*Gen. Motors Co. v. Dinatale*, 705 F. Supp. 2d 740 (E.D. Mich. 2010)...................22

*Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011) ........................................ 9, 10, 12

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................ 19, 24

*Keeton v. Hustler Magazine, Inc.*, 445 U.S. 770 (1984).................................. 17, 18

*Lanier v. Am. Bd. of Endotronics*, 843 F.2d 901 (6th Cir. 1998) ...........................14

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957)..................................................13

*Myers v. Am. Dental Ass'n*, 695 F.2d 716 (3d Cir. 1982) .......................................12

*Neogen Corp. v. Neo Gen Screening, Inc.*, 292 F.3d 883 (6th Cir. 2002)...............24

*Palmer v. Braun*, 376 F.3d 1254 (11th Cir. 2004)....................................................11

*Pilgrim Badge & Label Co. v. Barrios*, 857 F.2d 1 (1st Cir. 1988) .......................11

*Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978)...........................10

*Rountree v. Ching Feng Blinds Indus.*, 393 F. Supp. 2d 942 (D. Alaska 2005) .....14

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374 (6th Cir. 1968)......................13

*Schnabel v. Lui*, 302 F.3d 1023 (9th Cir. 2002)........................................................12

*Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012) ..............................................15

*Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212 (6th Cir. 1989)...................9

*Sifers v. Horen*, 385 Mich. 195 (1971) ....................................................................13

*State Auto Ins. Co. v. Thomas Landscaping & Construction, Inc.*,
   494 F. App'x 550 (6th Cir. 2012) ........................................................................10

*Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003) .........................................10

*Theunissen v. Matthews*, 935 F.2d 1454 (6th Cir. 1991)....................................9, 22

*Tobin v. Astra Pharm. Prods, Inc.,* 993 F.2d 528 (6th Cir. 1993)................... 18, 19

*United States v. 51 Real Pieces of Property Roswell, N.M,*
   17 F.3d 1306 (10th Cir. 1994) .............................................................................12

*Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)............................17

**Publications**

5 Wright & Miller, Federal Practice & Procedure: Civil § 1384 at 837 (1969)......11

**Rules**

Fed. R. Civ. P. 7(b) .............................................................................12

Fed. R. Civ. P. 12(b)(2).........................................................................9

## ISSUE PRESENTED

Does this Court have personal jurisdiction over Defendant United States Conference of Catholic Bishops?

Defendant answers: No

Plaintiff answers: Yes

## INTRODUCTION

This negligence action arises out of the policies drafted and promulgated by Defendant United States Conference of Catholic Bishops ("USCCB" or "Defendant") that caused Plaintiff Tamesha Means not to receive proper treatment and information regarding her miscarriage and to incur severe harm.[1]

On December 1, 2010, when she was 18 weeks pregnant, Ms. Means began to miscarry. Three times, she went to the only hospital in her county, Mercy Health Partners ("MHP"), but she was repeatedly denied information about her condition and appropriate care and, instead, was sent home. Ms. Means was denied appropriate care and treatment because MHP and its staff were bound to follow USCCB's Ethical and Religious Directives for Catholic Health Care Services ("Directives") which prohibited any staff member at the hospital from assisting Ms. Means in the completion of her miscarriage. Compl. ¶ 57.

Documents published by USCCB make plain that USCCB drafts and publishes the Directives with the express purpose of ensuring that Catholic health care institutions, including those in Michigan, follow them. *See, e.g.*, Ex. 1 at 12 ¶ 5; Ex. 3. As the name suggests, USCCB's Directives are mandatory policies for

---

[1] Although Defendant attempts to characterize Plaintiff's claim as one of medical malpractice, Michigan recognizes a claim of "independent negligence" against an institutional defendant that arises out of healthcare policies and procedures. *Theopholis v. Lansing Gen. Hosp.*, 430 Mich. 473, 478 n.3 (1988)(opinion of Griffin, J.).

Catholic hospitals, which are expressly mandated to require compliance with the Directives by their staff. Compl. ¶¶ 62, 64; Ex. 1 at 12 ¶ 5, 13 ¶ 9.

Because Ms. Means' injuries were caused when, as USCCB intended, the hospital adhered to the Directives, Ms. Means has brought this action against USCCB for negligence. In an effort to avoid taking responsibility for the harm the Directives caused, USCCB argues that this Court lacks personal jurisdiction over it because, it alleges, USCCB has no presence in Michigan. This argument must fail for two reasons. First, USCCB has waived this defense by failing to move for dismissal on this ground along with its request for dismissal based on improper venue. Second, even if USCCB had not waived this defense, it is clear that this Court has personal jurisdiction over USCCB because USCCB purposefully directed its activities at Michigan to ensure precisely what occurred here – that the Directives are implemented and adhered to at the Catholic hospital in Michigan where Ms. Means sought medical treatment.

## FACTS

In order to avoid this Court's jurisdiction, Defendant goes to great lengths to paint itself as a Washington, D.C.-based entity that has only sporadic and largely unintentional contacts with Michigan. Def.'s Br. [Doc. #39] at 4, 14. This wholly inaccurate portrayal significantly downplays USCCB's extensive, deliberate, and ongoing presence and activities in Michigan, including but not limited to its

instructions concerning the provision of health care at Michigan Catholic hospitals that resulted in Ms. Means' injuries.

As a preliminary matter, USCCB has strong financial connections to this state. USCCB receives a significant part of its funding through annual assessments of dioceses, including those in Michigan, which totals millions of dollars each year. *See* Ex. 4 at 4. In fact, with six dioceses, Michigan is one of the top 10 states with respect to the number of dioceses contributing these assessments. Ex. 18 at 15-16. In turn, USCCB routinely provides direct financial support to multiple entities in Michigan. *See, e.g.,* Ex. 9 at 2.

Second, in its own words, Defendant is a "service or professional organization" that "provides support and assistance to Diocesan and other service organizations throughout the United States." Def.'s Br. at 3.[2] Although discovery has not yet begun, it is already apparent from publicly available information that Defendant intentionally directs this support and assistance towards Michigan in a number of ways, both in general, and in ways specifically related to USCCB's policies that prohibited MHP from providing appropriate care to Ms. Means. For example, USCCB regularly provides practical information, guidance and

---

[2] According to USCCB's website, "[i]ts purposes under civil law are: '*To unify, coordinate, encourage, promote and carry on* Catholic activities in the United States; to organize and conduct religious, charitable and social welfare work at home and abroad; to aid in education; to care for immigrants; and *generally to enter into and promote by education, publication and direction the objects of its being.*'" (emphasis added). Ex. 17 at 1.

assistance coordinating programs and campaigns throughout Michigan. *See, e.g.*, Ex. 8 at 1 (noting that USCCB sent bulletin inserts to almost 19,000 parishes across the country about USCCB's position on health care issues). Each Michigan diocese has a pro-life office that "receive[s] information and guidance from [USCCB's] Secretariat for Pro-Life Activities," Ex. 7 at 6, and Michigan dioceses have set up programs at the request of, and in accordance with guidelines set forth by, USCCB. *See, e.g.*, Ex. 8 at 5. As just one example, the Diocese of Grand Rapids, which has jurisdiction over the hospital where Ms. Means sought treatment and several other hospitals in Michigan, has set up a pro-life ministry and includes a link to Defendant's Directives on its pro-life ministry web page. *See* Ex. 7 at 7. [3]

USCCB also conducts trainings in Michigan, Ex. 8 at 7 (noting that USCCB was scheduled to conduct a training at the Diocese of Kalamazoo in 2014), and seeks to mobilize Michigan residents to take action on various political issues, *see, e.g.*, Ex. 19 (webpage with link directing Michigan residents to sign-up for USCCB's Action Network).

---

[3] USCCB routinely relies on Dioceses and other entities in Michigan to implement USCCB programs and policies. For example, in 2002, Defendant established "a comprehensive set of procedures . . . for addressing allegations of sexual abuse of minors by Catholic clergy" that "*directs* action" on a number of matters. Ex. 23. To ensure compliance with these procedures, USCCB audits Michigan dioceses on a regular basis. *See, e.g.*, Ex. 6. In view of this longstanding program, Defendant's categorical assertion that "[t]he USCCB does not direct, oversee or supervise Bishops' activities on matters concerning the administration of their Dioceses . . . in Michigan or elsewhere," Def.'s Br. at 4, is simply not accurate.

Of particular relevance here, USCCB drafts and promulgates the Directives that govern the provision of certain aspects of health care at all Catholic hospitals, including at over fifteen such hospitals in Michigan alone. *See* Compl. ¶¶ 60, 61; Ex. 16; *see also* Def.'s Br. at 6. These Directives are "concerned primarily with institutionally based Catholic health care services . . . and address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services." Ex. 1 at 4. Indeed, Catholic health care entities, such as MHP, where Ms. Means sought care, are required to adhere to the Directives. As the Directives themselves state: "Catholic health care services *must* adopt these Directives as policy, *require adherence* to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel." *Id.* at 12 ¶ 5 (emphasis added); *see also id.* at 13 ¶ 9 ("Employees of a Catholic health care institution *must* respect and uphold the religious mission of the institution and adhere to these Directives." (emphasis added)). Defendant thus cannot dispute that it intends and expects Catholic hospitals in Michigan to adopt and require adherence to the Directives. The bishop for the Diocese of Lansing has in fact heeded Defendant's recommendation and used his authority to require Catholic hospitals within his jurisdiction to adhere to the Directives. *See* Ex. 22. Moreover, the USCCB's Secretariat for Pro-Life

Activities travelled to Michigan to discuss the Directives at a healthcare conference held at a Catholic hospital. *See* Ex. 21.  In addition, the Archbishop of Detroit sits on the USCCB Committee on Doctrine, which is responsible for promulgating the Directives. *See* Ex. 12 at 1.

Defendant USCCB's attempt to characterize the Directives as nothing more than a "statement of the [USCCB's] . . . moral and religious positions as they related to health care issues," Def.'s Br. at 6, is simply not credible. To the contrary, the plain language of the Directives reveals that it is exactly that: a set of detailed *directives* concerning the policies, practices, and the day-to-day provision of health care at Catholic hospitals around the country, including in Michigan.

In fact, adoption and adherence to the Directives allows a health care entity to be designated as "Catholic," and thus be considered a "subsidiary organization" of USCCB, a status that carries significant tax implications. *See, e.g.,* Ex. 14 (hospital stripped of Catholic identity for failure to follow the Directives); Ex. 10 at 17–19 (describing USCCB criteria for classifying entity as a "subsidiary organization" of USCCB).  Each year USCCB provides the IRS with the names of "agencies and instrumentalities and all educational, charitable, and religious institutions operated, supervised or controlled by or in connection with the Roman Catholic Church in the United States, its territories, or possessions." *See* Ex. 10 at 9.  In turn, the IRS issues a group ruling designating USCCB and all its "subsidiary

organizations" as tax exempt. *Id.* at 9-10. MHP and its parent company, Trinity Health, are both designated as USCCB subsidiary organizations. *See Id.* at 9 (designating all entities listed in Official Catholic Directory as subsidiary organizations); Ex. 11 at 2-3 (select pages from Official Catholic Directory).

The Directives are also "reviewed periodically by [USCCB] . . . in order to address new insights from theological and medical research or new requirements of public policy." Ex. 1 at 4. An example serves to illustrate the point: In 2010, in response to a Catholic hospital's decision to allow a life-saving abortion, Defendant USCCB issued a statement entitled "The Distinction Between Direct Abortion and Legitimate Medical Procedures." *See* Ex. 3; Ex. 2 at 1–3. The purpose of the statement was to "clarify" that the life-saving abortion in question was not permitted by the Directives. [4] Ex. 2 at 1. This clarification was disseminated to the public through USCCB's own media outlet, Catholic News Service, and "provided to all of the bishops," including those in Michigan. *See* Ex. 3 at 1. Again, Defendant cannot seriously contend that in issuing these statements

---

[4] In its brief, Defendant attempts to engage Plaintiff in an argument over the substance of the Directives and whether its categorical prohibition on abortion in Catholic hospitals (even where the woman's life is at risk) "requires or even allows a pregnant mother to be harmed in any way." Def.'s Br. at 5. This statement is flatly contradicted by Defendants own words. *See* Ex. 2. In any event, however, this question goes to the merits of Plaintiff's claim and not the personal jurisdiction issue that is currently before this Court.

and distributing them widely it did not intend and expect Catholic hospitals in Michigan to conform their medical practices accordingly.[5]

In short, Defendant does not (because it cannot) deny that it is the author of the Directives. Likewise, Defendant does not (because it cannot) dispute that it publishes the Directives with the knowledge, intent, and expectation that the Directives be adopted in full by subordinate organizations providing health care services, and that there are at least 15 such subordinate organizations, including Trinity Health and MHP, in Michigan. Thus, contrary to what Defendant argues, "[t]aken at face value," Def.'s Br. at 14, the Directives have a direct connection with Michigan and, as established below, the test for personal jurisdiction is met here.

## STANDARD OF REVIEW

Where, as here, the court's decision on a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) is solely premised upon written submissions or affidavits, rather than discovery or an evidentiary hearing, "the

---

[5] In 2009, after debate over whether Catholic hospitals may withdraw artificial nutrition and hydration from patients in a persistent vegetative state, USCCB issued a revision to the existing Directives to make clear that "the obligation [to provide patients with food and water] extends to patients in chronic and presumably irreversible conditions (e.g., the 'persistent vegetative state') who can reasonably expected to live indefinitely if given such care." *See* Ex. 20 at 1. According to the press release disseminated through the Catholic News Service, the revisions were intended to help "medical practitioners to 'follow the appropriate medical protocols'" at Catholic hospitals. *Id.*

burden on the plaintiff is 'relatively slight.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (citing *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988)). The court must view the pleadings and affidavits "in a light most favorable to the plaintiff." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991). Accordingly, "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Air Prods.*, 503 F.3d at 549 (citing *Theunissen*, 935 F.2d at 1458). This "relatively light standard" prevents a defendant from "'defeat[ing] personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff.'" *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (quoting *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)).

## ARGUMENT

### I.    USCCB Has Waived Its Personal Jurisdiction Defense.

"'[T]he requirement that a court have personal jurisdiction is a due process right that may be waived either explicitly or implicitly.'" *Gerber v. Riordan*, 649 F.3d 514, 518 (6th Cir. 2011) (quoting *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006)). For this reason, "a challenge to personal jurisdiction must be raised in the first responsive pleading or be waived." *Taubman Co. v. Webfeats*, 319 F.3d 770, 773 (6th Cir. 2003); *see also id.* (enforcing waiver

rule against pro-se litigant); *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978) (finding waiver of personal jurisdiction defense where defendant did not include the defense in its motion to dismiss). To determine whether a defendant has waived its personal jurisdiction defense, the court considers "whether any of the defendant's appearances and filings constitute 'legal submission to the jurisdiction of the court.'" *State Auto Ins. Co. v. Thomas Landscaping & Construction, Inc.*, 494 F. App'x 550, 553 (6th Cir. 2012) (quoting *Gerber*, 649 F.3d at 519). As explained below, by not only concurring in its co-defendants' motion to change venue, but also independently asking this Court to dismiss the cause of action against it based on improper venue, all before filing the instant motion, USCCB has submitted to the jurisdiction of this Court and thereby waived its objection to personal jurisdiction.

On February 3, 2014, USCCB entered notices of special appearance in this matter. *See* Doc. #14; Doc. #15. The notices stated the appearance was "for the limited purpose of challenging personal jurisdiction and concurring in Co-Defendants' venue challenge." Doc. #14 at 2; Doc. #15 at 2. Notwithstanding whether a concurrence in co-defendants' venue challenge itself falls outside the limited scope of a special appearance, USCCB nonetheless went much further and filed a brief asking for an entirely different form of relief than its co-defendants. *See* Doc. #17. Unlike USCCB's co-defendants who asked only for a *change* of

venue to the Western District of Michigan, *see* Doc. 13, USCCB filed a separate

motion that requested the additional relief of outright dismissal. [6]

In circumstances strikingly similar to those at bar, courts have routinely held

that defendants waive their personal jurisdiction defenses by not including them in

their motion to dismiss for improper venue. As the First Circuit explained:

> The purpose of Rule 12(g), (h) is to eliminate the presentation of these
> defenses in a piecemeal fashion. Thus, "[s]ubdivision (g) contemplates the
> presentation of an omnibus pre-answer motion in which defendant advances
> every available Rule 12 defense and objection he may have that is assertable
> by motion.

*Pilgrim Badge & Label Co. v. Barrios*, 857 F.2d 1, 3 (1st Cir. 1988) (quoting 5

Wright & Miller, *Federal Practice & Procedure:* Civil § 1384 at 837 (1969)); *see*

*also Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004) (finding defense of

personal jurisdiction waived where party raised only a challenge to venue in its

first motion); *Schnabel v. Lui*, 302 F.3d 1023, 1033 (9th Cir. 2002) (finding

defendant waived defense of lack of personal jurisdiction "by failing to raise the

defense in its first motion under Rule 12(b)"); *United States v. 51 Real Pieces of*

---

[6] USCCB is likely to argue that because it labeled its brief a "Response to Co-Defendants' Motion to Change Venue" (Doc. #17), it was not a motion. However, under Rule 7, a motion is a written request for a court order that states its grounds and states the relief sought. Fed. R. Civ. P. 7(b). Further, under Rule 12, the defense of improper venue must be raised either in the defendant's answer or a pre-answer 12(b) motion. Fed. R. Civ. P. 12(b). As USCCB's brief was not an answer, and asked for specific relief from this Court that even its co-defendants did not request, it must be construed as a Rule 12(b) motion regardless of how USCCB chose to label it.

*Property Roswell, N.M*, 17 F.3d 1306 (10th Cir. 1994) (explaining that Rule 12(h) requires party to raise personal jurisdiction defense in first motion that is a "defensive move"); *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 721(3d Cir. 1982) (defense of personal jurisdiction waived when not included in defendant's motion to dismiss for improper venue).

As in these cases, here there can be no doubt that USCCB's motion to dismiss for lack of venue was a "significant defensive move" that "directly seeks to have the district court use its power over the parties" to bind them to a particular outcome. *See Gerber*, 649 F.3d at 525 (Moore, J., concurring) (internal citations omitted). Accordingly, because USCCB has already filed a motion requesting dismissal for improper venue and failed to argue its personal jurisdiction defense in that motion, the Court should deem the personal jurisdiction defense waived.

II.   **This Court Has Specific Jurisdiction Over USCCB Because USCCB Has Purposefully Directed Its Activities at Michigan Residents and This Litigation Arises Out of Those Activities.**

Through publishing its Directives with the intent and expectation that they would be followed by all Catholic hospitals in Michigan and providing all bishops, again including those in Michigan, with specific instructions on how Catholic hospitals in their jurisdictions should interpret the Directives, USCCB has purposefully directed its activities toward this forum and caused Plaintiff harm as a result. Accordingly, USCCB is subject to specific jurisdiction in Michigan for this

suit.

The Sixth Circuit has set forth a three-part test to determine whether the exercise of specific jurisdiction over a defendant satisfies due process:[7]

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Prods.*, 503 F.3d at 550 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

For specific jurisdiction, no specific quantum of activities is required; "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State." *Id.* at 476.

## A.    USCCB purposefully availed itself of Michigan as a forum.

To determine whether an out-of-state non-profit corporation such as USCCB has purposefully availed itself of the Michigan forum, the court must simply

---

[7] As USCCB notes in its brief, Michigan's long-arm statute has long been construed to provide the broadest possible jurisdiction to non-resident defendants that is consistent with due process. *See* Def.'s Br. at 7 n.3 (citing *Sifers v. Horen*, 385 Mich. 195 (1971)). USCCB is subject to personal jurisdiction under Michigan's long-arm statute and has not contested this point.

"consider the service that [USCCB] attempted to provide nationwide and determine the extent to which its actions created a presence in Michigan." *Bennett v. J.C. Penney*, 603 F. Supp. 1186, 1188 (W.D. Mich. 1985). In *Lanier v. American Board of Endotonics*, 843 F.2d 901 (6th Cir. 1998), the Sixth Circuit held that a non-profit national dental certifying board located in Illinois had purposefully directed its activities toward Michigan by sending application materials to a Michigan dentist and subsequently corresponding with her from Illinois at different stages of the application process. The court found these minimal acts sufficient because the Board's goal was to have Michigan dentists meet its certification standards and thus allow the Board to have "ongoing, far-reaching consequences in the Michigan dental services market." *Id.* at 911; *see also Bennett,* 603 F. Supp. at 1188-89 (finding association had purposefully availed itself of Michigan by, *inter alia*, having members in Michigan and requiring members to comply with association standards and presenting itself as a "national trade association dedicated to high standards and a strict code of ethics"); *Rountree v. Ching Feng Blinds Indus.*, 393 F. Supp. 2d 942, 947 (D. Alaska 2005) (finding association had purposefully directed its activities toward the forum state by developing warning standards for its members to use and allowing those warnings to be used on products sold in the forum).

In another example, the Sixth Circuit found the purposeful availment prong satisfied where an out-of-state defendant attorney drafted letters that were subsequently sent by a third party to numerous investors, including a plaintiff located in the forum state. *Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012). Although the defendant drafted the letter with the knowledge that it would be sent to investors, he did not personally send the letter to any investor nor have specific awareness of the states in which the investors were located. For those reasons, the defendant argued that personal jurisdiction was lacking in the plaintiff's forum. The Sixth Circuit disagreed, stating this was not an instance where the defendant's letter reached an out-of-state plaintiff by "'fortuitous' misfortune" or "'attenuated' circumstances." *Id.* at 702. Rather, the court found that the defendant drafted the letter knowing that the third party would send them to people such as the plaintiff. *Id.* at 703. With respect to the defendant's second rationale, the court determined that the defendant had the names and addresses of all of the investors, or at least had "access to that information at his fingertips." *Id.* As a result, the defendant "knew where the various investors were located" and thus had "purposefully availed himself of the benefits and burdens of the [forum state]." *Id.*

As these decisions illustrate, an organization that seeks to further its goal of having individuals or entities in Michigan adhere to its standards has purposefully availed itself of the Michigan forum. *See Lanier*, 843 F.2d at 911. In addition, an

entity that drafts documents with the intent that it will reach and impact a particular class of individuals, has purposefully availed itself of the forums where those individuals are located. This is exactly what USCCB did. The Directives clearly indicate that USCCB's goal is to set forth mandatory policies with respect to the provision of certain health care services for patients such as Plaintiff within all Catholic hospitals, including those in Michigan. *See* Ex. 1 at 12 ¶ 5 (stating Catholic health care services "*must* adopt these Directives as policy, [and] *require adherence* to them within the institution as a condition for medical privileges and employment." (emphasis added)). Unsurprisingly, Michigan-headquartered Catholic healthcare system Trinity Health, the parent corporation of MHP, follows USCCB's mandate and explicitly states in its standards of conduct and corporate bylaws that all of its hospitals must adhere to the Directives. *See* Ex. 15 at 3; Ex. 16. In part because Trinity Health and MHP adhere to the Directives, they are each designated as a "catholic institution" and thus receive the significant benefit from USCCB of being part of its IRS tax-exempt ruling. Ex. 10 at 1; Ex. 13 ¶ 78. Further, because entities must apply to USCCB to be included in its tax exempt ruling, USCCB knew the names and addresses of each Catholic hospital that adheres to its directives, including MHP. *See* Ex. 10 at 12.

Of particular relevance, just months before Plaintiff suffered injury at MHP, USCCB issued a statement to all bishops, including the bishops in Michigan with

authority over Trinity Health and MHP, clarifying that the Directives prohibit physicians at Catholic health care institutions from acting to terminate a pregnancy, even in situations like Ms. Means', where the failure to do so will harm the woman. *See supra* at 10; *see also* Ex. 2. [8]

Together, the aforementioned acts amply demonstrate that in furthering its organizational goals, USCCB took significant action designed to ensure that all Catholic health care entities in Michigan, including Trinity and MHP, adhered to the Directives. Personal jurisdiction in this forum is therefore appropriate. *See Lanier*, 843 F.2d at 911; *Bennett*, 603 F. Supp. at 1188.

Supreme Court decisions pertaining to for-profit corporations also support a finding of purposeful availment in this case. On multiple occasions, the Court has explained that a defendant purposefully avails itself of a forum by placing a product in the stream of commerce and engaging in conduct that "indicate[s] an intent or purpose to serve the market in the forum State" in such ways as "designing the product for the market" or "establishing channels for providing regular advice to customers." *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal.*, 480

---

[8] In addition to providing its own mandate for Catholic hospitals, USCCB also recommends to local bishops that they use their authority to ensure that Catholic health care services in their dioceses implement the Directives. Ex. 1 at 43. Following this recommendation, the Diocese of Lansing issued a decree in 2010 that further instructs Catholic hospitals within its jurisdiction to follow the Directives. *See* Ex. 22.

U.S. 102, 112 (1987); *see also World-Wide Volkswagen Corp. v. Woodson*, 444

U.S. 286, 297 (1980) ("[I]f the sale of a product of a manufacturer or distributor . .

. is not simply an isolated occurrence, but arises from the efforts of the

manufacturer or distributor to serve directly or indirectly, the market for its product

in other States, it is not unreasonable to subject it to suit in one of those States if its

allegedly defective merchandise has there been the source of injury to its owner or

to others."). The Court has further explained that a state "does not exceed its

powers under the Due Process Clause if it asserts personal jurisdiction over a

corporation that delivers its products into the stream of commerce with the

*expectation* that they will be purchased by consumers in the forum State." *Id.* at

297-98 (emphasis added). Under this rationale, the Court has held that the

purposeful availment prong was satisfied where a national magazine merely

circulated its publication within the forum state. *See Keeton v. Hustler Magazine,*

*Inc.*, 465 U.S. 770, 781 (1984).

Along those same lines, the Sixth Circuit has found that where a defendant

enters into a contract to have its product distributed nationwide, that is sufficient

evidence of purposeful availment in the forum where distribution took place, even

if the defendant "'did nothing in particular to purposefully avail itself of the

[forum's] market as distinguished from any other state in the union.'" *Bridgeport*

*Music, Inc. v. Still N the Water Pub*, 327 F.3d 472, 483-84 (2003) (per curiam)

(quoting *Tobin v. Astra Pharm. Prods, Inc*., 993 F.2d 528, 544 (6th Cir. 1993)).

As these cases make clear, the paramount factor in the purposeful availment analysis is the defendant's intent to have its materials used in the forum. Thus, courts dealing with this issue focus their inquiry on whether there is sufficient evidence to demonstrate a prima facie finding of defendant's intent. In *Keeton*, the Court found that the defendant's act of circulating its publication in New Hampshire demonstrated its intent to have its publication read in that state. 445 U.S. at 781. This was so notwithstanding the fact that the defendant circulated its publication in all states. Likewise, in *Bridgeport Music, Inc.,* the sheer act of entering into a nationwide distribution agreement evidenced the defendant's "understanding" that its products would be distributed nationwide, even though the defendant did not "affirmatively require" the products to be specifically distributed in the forum. 327 F.3d at 484. In contrast, the Court in *Asahi* found that the defendant's act of supplying materials to a company in Taiwan did not evidence intent to have those materials used in California.

Here, the evidence substantially demonstrates USCCB's intent to have the Directives used at all Catholic hospitals, including those in Michigan. USCCB does not have to do anything "in particular to purposefully avail itself of the [Michigan] market as distinguished from any other state in the union," *Bridgeport Music, Inc.* 327 F.3d at 483-84 (citing *Tobin*, 993 F.2d at 544), for the Court to

find here what USCCB's own Directives unambiguously indicate—that USCCB intended its Directives to be followed at all Catholic hospitals, including those in Michigan. *Id.*[9]

In this case, the plain language of the Directives demonstrates Defendant's intent and expectation that Catholic hospitals in Michigan and elsewhere adopt and adhere to its Directives. *See* Ex. 1 at 12 ¶¶ 4-6. USCCB's drafting the Directives in this manner, coupled with additional actions it has taken to ensure those Directives are adhered to in the manner it has deemed proper, are more than sufficient under longstanding Supreme Court and Sixth Circuit precedent to find that USCCB has purposefully availed itself of the Michigan forum under the prima facie standard. *See, e.g.*, *Bridgeport Music, Inc.*, 327 F.3d at 484.

## B. This case arises from USCCB's activities directed at Michigan.

The second factor requires the cause of action to arise from the defendant's activities in Michigan—a "'lenient standard'" that does not require the claim to "'formally' arise from the defendant's contacts" with the forum state. *Air Prods.*, 503 F.3d at 553 (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)). A

---

[9] Defendant mistakenly claims that purposeful availment requires "some substantial contact that arises out of the relationship or transaction between the defendant and the plaintiff." *See* Def. Br. at 13-14. However, all due process requires is that the defendant have "certain minimum contacts with the *forum*," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (emphasis added), and, for specific jurisdiction, that the plaintiff's claim arise out of those contacts, *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (citing *Int'l Shoe*, 326 U.S. at 318). No explicit relationship or transaction between the plaintiff and defendant is required.

plaintiff can meet this standard merely by showing that her claim is "made possible by" the defendant's activity in the forum state. *Id.*

The "arising from" requirement is clearly met here. Plaintiff's claims arise from the implementation of USCCB's Directives at a Catholic hospital in Michigan. In other words, these claims were "made possible by" USCCB's decision to require Catholic hospitals like MHP to follow its Directives, and USCCB's act of clarifying for Michigan bishops—including those with authority over Trinity Health and MHP—that the Directives explicitly prohibits the kind of treatment that Plaintiff required.

Defendant's argument to the contrary is unpersuasive. In conflating the venue analysis with the necessary requirements for personal jurisdiction, Defendant asserts that "[t]he *only* connection alleged between the directives and Michigan is the individual co-Defendants, allegedly acting for a non-party, Mercy Health Partners, are purported to have made a decision in Michigan to adhere to the directives." Def.'s Br. at 14 (emphasis in original). Although Plaintiff argued in her opposition to Defendants' venue motions that the aforementioned act is a "substantial part of the events . . . giving rise to [Plaintiff's] claims," 28 U.S.C. § 1391(b)(2), Plaintiff does not allege that this is the *sole* basis on which to impose liability on Defendant. Rather, Plaintiff alleges in the Complaint that MHP is a Catholic health care service in Muskegon, Michigan, Compl. ¶¶ 88, 99, that

USCCB "stated Catholic health care services must adopt its Directives as policy," *id*. ¶ 97 and "intended for Catholic hospitals such as MHP to adhere to the Directives, and that it was foreseeable to USCCB that Catholic health care services such as MHP would adhere to the Directives," *id*. ¶ 71. Plaintiff further alleges that an MHP official stated that the Directives dictated Plaintiff's treatment at MHP. *Id.* ¶ 57. These allegations directly connect USCCB's own acts to the injuries Plaintiff suffered in Michigan.[10]

## C. The exercise of jurisdiction over USCCB is reasonable.

Finally, as set forth *supra*, "the acts of the defendant or consequences caused by the defendant" have more than a "substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable" here. *Air Prods.*, 503 F.3d at 554 (citations and quotations omitted). As an initial matter, it is well-settled in this circuit that "where the first two criteria [of the minimum contacts test] are satisfied, only the unusual case will not meet th[e] third criterion [of reasonableness]." *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.,* 138 F.3d 624, 628 (6th Cir. 1998) (citations and quotations omitted); *see also Air Prods.*, 503 F.3d at 554 ("'[W]here a defendant who purposefully has directed his

---

[10] USCCB appears to be arguing in its motion that despite the mandatory language in the Directives requiring Catholic hospitals and their employees to adhere to them, it is mere coincidence that Trinity Health and MHP did in fact adhere to them. This argument defies reason and should not be given credence by this Court.

activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" (quoting *Burger King*, 471 U.S. at 477)); *Theunissen*, 935 F.2d at 1461 (same); *Gen. Motors Co. v. Dinatale*, 705 F. Supp. 2d 740, 751 (E.D. Mich. 2010) (same). Nothing indicates that this is an unusual case. Indeed, Defendant has not even argued that jurisdiction would be unreasonable or set forth facts that would support such a conclusion. To the contrary, the facts—which must be construed in the light most favorable to Plaintiff—overwhelmingly support a finding of reasonableness in this case. Thus, Defendant can make no such compelling case to defeat personal jurisdiction.

In determining whether jurisdiction is reasonable, courts consider the interest of the forum state; the plaintiff's interest in obtaining relief; other states' interests in securing the most efficient resolution of the policy; and the burden on the defendant. *Air Prods.*, 503 F.3d at at 554-55 (citation omitted). Here, Michigan undoubtedly has an interest in ensuring that patients, like Ms. Means, seeking care at Michigan hospitals obtain appropriate medical care. And, of course, Ms. Means' interest in obtaining relief for the harm caused to her by these policies is substantial. Certainly, Defendant can point to no other forum that has a greater interest in hearing this claim. Defendant drafted and promulgated standards that it fully intended to be adhered to and applied at Catholic hospitals in Michigan; as

expected, these standards were implemented at MHP, a Catholic hospital located in Michigan; and, at least one Michigan resident has suffered injuries as a result. Finally, courts have recognized that given the ease of travel in the modern era, the burden on a corporate defendant to defend itself in an out-of-state forum where it intentionally and regularly avails itself of the privilege of conducting its activities is slight. *See McGee*, 355 U.S. at 223. When this slight burden is weighed against the other factors that strongly support litigation in this forum, this Court's exercise of jurisdiction over Defendant in this matter is eminently reasonable.

In sum, by promulgating the Directives and taking numerous actions to ensure that Catholic hospitals in Michigan—including the hospital where Ms. Means sought treatment—adhere to them, USCCB purposefully directed its activity toward this forum and harmed Plaintiff as a result. Accordingly, Defendant "could reasonably anticipate being haled into a court in Michigan" and the exercise of jurisdiction by this Court "does not offend 'traditional notions of fair play and substantial justice.'" *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893 (6th Cir. 2002) (citing *Int'l Shoe*, 326 U.S. at 316). USCCB's motion to dismiss should therefore be denied. [11]

---

[11] Plaintiff has obtained the information used to support this response without the benefit of discovery. Should the court require additional information regarding USCCB's ample contacts with Michigan, Plaintiff requests the opportunity to conduct discovery prior to the court's ruling on this motion.

# CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court deny Defendant USCCB's motion to dismiss for lack of personal jurisdiction.

Dated: May 11, 2015                     Respectfully submitted,

/s/ Louise Melling                      /s/ Daniel Korobkin
_____                 _____
Louise Melling                          Brooke A. Tucker  (P79136)
Jennifer Dalven                         Daniel S. Korobkin (P72842)
Alexa Kolbi-Molinas                     Michael J. Steinberg (P48085)
Jennifer Lee                            Kary L. Moss (P49759)
AMERICAN CIVIL LIBERTIES                AMERICAN CIVIL LIBERTIES
UNION FOUNDATION                        UNION FUND OF MICHIGAN
125 Broad Street, 18th Floor            2966 Woodward Ave.
New York, NY 10004                      Detroit, MI 48201
(212) 549-2633                          (313) 578-6823

                                        /s/ Don Ferris
                                        _____
                                        Don Ferris (P26436)
                                        Heidi Salter-Ferris (P41481)
                                        Cooperating Attorneys, ACLU Fund of
                                        Michigan
                                        FERRIS & SALTER, P.C.
                                        4158 Washtenaw Ave.
                                        Ann Arbor, MI 48108
                                        (734) 677-2020

*Attorneys for Plaintiff Tamesha Means*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2015 I filed the foregoing document through the electronic filing system and that the ECF clerk will electronically serve all counsel through the electronic filing system.

/s/ Brenda Bove