## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TAMESHA MEANS,

              Plaintiff,

vs.

UNITED STATES CONFERENCE OF CATHOLIC
BISHOPS, a not-for-profit corporation, STANLEY
URBAN, ROBERT LADENBURGER, and MARY
MOLLISON,

              Defendants.

_____/

Hon. Robert Holmes Bell

Case No. 15-cv-00353-RHB

Brooke A. Merriweather-Tucker (P79136)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org
kmoss@aclumich.org

Don Ferris (P26436)
Heidi Salter-Ferris (P41481)
Cooperating Attorneys, American Civil
  Liberties Union Fund of Michigan
FERRIS & SALTER
5147 Washtenaw Avenue
Ann Arbor, MI 48108
(734) 677-2020
dferrisalt@aol.com

*Attorneys for Plaintiff*

Louise Melling*
Jennifer Dalven
Brigitte Amiri
Alexa Kolbi-Molinas*
Jennifer Lee
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
lmelling@aclu.org
jdalven@aclu.org
bamiri@aclu.org
akolbi-molinas@aclu.org
jlee@aclu.org

*Motion for admission to be filed

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS URBAN, LADENBURGER, AND MOLLION'S MOTION TO DISMISS

## [ORAL ARGUMENT REQUESTED]

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

TABLE OF AUTHORITIES ................................................................................................. ii

FACTS ................................................................................................................................... 2

I.      Ms. Means Suffered Harm After Seeking Treatment at a Hospital that Adhered to Policies Adopted by the CHM Defendants.................................................................................................. 2

II.     The CHM Defendants' Negligent Acts Caused Ms. Means' Injury. ................................... 4

ARGUMENT ........................................................................................................................ 5

I.      Ms. Means Has Adequately Pled a Direct Liability Claim Against the CHM Defendants for Independent Negligence. ........................................................................................................ 6

    A.   Under Michigan Law, Individuals and Institutions Are Subject to Tort Liability for Claims that Arise Out of Hospital Policies and Procedures. ................................................................. 6

    B.   Ms. Means' Allegations of Proximate Causation Are Sufficient to Survive a 12(b)(6) Motion to Dismiss. ................................................................................................................ 12

II.     The Michigan Refusal Statutes Cannot Shield the Individual Defendants From Liability in the Context of Emergency Treatment of Miscarriage.................................................................. 15

III.    The Church Autonomy Doctrine Is Inapplicable in This Case. ......................................... 19

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341 (W.D. Mich. 2011) ............................................. 11

*Allred v. Broekhuis*, 519 F. Supp. 2d 693, 695 (W.D. Mich. 2007) ............................................. 6

*Armstrong v. A.I. Dupont Hosp. for Children*, 60 A.3d 414 (Del. Super. Ct. 2012) ...................... 7

*Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006) ......................................... 16

*Barkes v. River Park Hosp.*,328 S.W.3d 829 (Tenn. 2010).......................................................... 7

Biegas v. Quickway Carriers, Inc., 573 F.3d 365 (6th Cir. 2009) ................................................. 6

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp.3d 817 (E.D. Mich. 2014)...................... 6

*Broder v. Corr. Med. Servs.*, No. 03-75106, 2008 WL 704229 (E.D. Mich. Mar. 14, 2008) ........ 8

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ............................................................................ 25

*Chesser v. LifeCare Mgmt. Servs.*, L.L.C., 356 S.W.3d 613
(Tex. Ct. App. 2011)............................................................................................................ 7, 8, 10

*Corleto v. Shore Mem'l Hosp.*, 350 A.2d 534 (N.J. Super. Ct. 1975) ........................................ 7

*Cox ex rel. Cox v. Bd. of Hosp. Managers for Flint*, 651 N.W.2d 356 (Mich. 2002) .................. 7

*Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)............................................................................. 24

*Dawson v. Norwood*, No. 1:06–cv–914, 2011 WL 2667962, at * 2 (W.D. Mich. July 5, 2011) . 15

*Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990)...................................... 23

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)............................................................ 25

*Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278 (6th Cir. 2010) .................................................. 6

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010) ...... 22

*Gen. Council on Fin. and Admin. of the United Methodist Church v. Super. Ct. of Cal.*, 439 U.S.
1369 (1978) .......................................................................................................................... 25

Golden v. City of Columbus, 404 F.3d 950 (6th Cir. 2005) ....................................................... 5

*Jones v. Wolf*, 443 U.S. 595 (1979) ...................................................................................... 19, 22

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) 20,
23

*Kirby v. Larson*, 256 N.W.2d 400 (Mich. 1977)........................................................................ 12

*Klanseck v. Anderson Sales & Serv., Inc.*, 393 N.W.2d 356 (Mich. 1986) ................................ 11

*Kuznar v. Raksha Corp.*, 750 N.W.2d 121 (Mich. 2008) ........................................................ 7

*Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008)................................................................... 5

*Lockridge v. Oakwood Hosp.*, 777 N.W.2d 511 (Mich. Ct. App. 2009) .................................... 14

*Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553 (Mich. 2011).......................... 11

*Malicki v. Doe*, 814 So.2d 347 (Fla. 2002)............................................................................... 22

*Martin v. Hardy*, 232 N.W. 197 (Mich. 1930).......................................................................... 7

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999)...... 21, 23

*Michigan Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*, 467
U.S. 461, 469 (1984) ............................................................................................................ 17

*Moses v. Providence Hosp. & Med. Ctrs.*, 561 F.3d 573 (6th Cir. 2009)................................ 11, 16

*Murday*, 419 N.W.2d at 453-54 ......................................................................................... 14

*Nowell v. Titan Ins. Co.*, 648 N.W.2d 157 (Mich. 2002) .................................................. 17

*O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853 (Mich. 2010) ........................... 12

*Ogle v. Hocker*, 279 Fed. App'x 391 (6th Cir. 2008) ................................................. 19, 20

*Potter v. McLeary*, 774 N.W.2d 1 (Mich. 2009) ............................................................... 7

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393
U.S. 440 (1969) ............................................................................................................ 22

*Presbyterian Church*, 393 U.S. at 450 ............................................................................. 24

*Roberts v. Bennett Enterprises, Inc.*, No. 04-73540, 2006 WL 3825067 (E.D. Mich. Dec. 26,
2006) ..................................................................................................................... 8, 9, 10

*Rupert v. Daggett*, 695 F.3d 417 (6th Cir. 2012) ...................................................... 10, 13

*Schultz v. Consumers Power Co.*, 506 N.W.2d 175 (Mich. 1993) .................................... 6

*Serbian E. Orthodox Diocese for the U.S. and Can. v. Milivojevich*, 426 U.S. 696 (1976)........ 19

*Theophelis v. Lansing Gen. Hosp.*, 424 N.W.2d 478 (Mich. 1988) .......................... 6, 9, 10

*Transp. Dep't v. Christensen*, 581 N.W.2d 807 (Mich. 1998) ....................................... 12

*Ware v. Bronson Methodist Hosp.*, No. 307886, 2014 WL 5689877 (Mich. Ct. App. 2014) ...... 10

*Watson v. Jones*, 80 U.S. 679 (1871) ....................................................................... 19, 20

*Ykimoff v. Foote Mem'l Hosp.*, 776 N.W.2d 114 (Mich. Ct. App. 2009) ...................... 13

*Zanke-Jodway v. City of Boyne City*, No. 1:08–cv–930, 2009 WL 3205969, at *31 (W.D. Mich.
Sep. 28, 2009) ........................................................................................................ 11

## Statutes

Consolidated Appropriations Act, Pub. L. No. 111-117, 123 Stat. 3034 (2009) ....................... 17

Mich. Comp. Laws § 333.1111 ............................................................................... 16, 18

Mich. Comp. Laws § 333.20181 .................................................................................. 16

Mich. Comp. Laws § 333.20183 .................................................................................. 17

Mich. Comp. Laws § 333.20201(1)(e) .......................................................................... 18

Mich. Comp. Laws § 600.2051(2) ............................................................................... 4, 9

Mich. Comp. Laws § 600.5838a(1) ............................................................................... 7

Mich. Comp. Laws. § 333.20201(1)(e) .......................................................................... 17

## Other Authorities

151 Cong. Rec. H176-02 (Jan. 25, 2005) .................................................................... 17

151 Cong. Rec. H177 (Jan. 25, 2005) .......................................................................... 17

Oxford Dictionaries (online ed. 2015), *available at*
http://www.oxforddictionaries.com/us/definition/american_english/advice ............................ 18

# INTRODUCTION

Each of the individual defendants -- Stanley Urban, Robert Ladenburger, and Mary Mollison -- is the current or past chair of Catholic Health Ministries ("CHM"), the unincorporated association responsible for the ownership, management and governance of Michigan-headquartered Trinity Health System and its affiliated hospitals. This negligence action arises out of the adoption of healthcare policies by these Defendants that prevented Plaintiff Tamesha Means from receiving appropriate medical care during her miscarriage.

Pursuant to CHM's authority, the Defendants required staff members at Trinity Health's affiliated hospitals to adhere to a set of policies entitled the Ethical and Religious Directives for Catholic Healthcare Services ("Directives"). Unbeknownst to many patients, the Directives prohibit staff members at these hospitals from providing appropriate medical care in some circumstances to women who are miscarrying, even when their health or life is in danger.

Ms. Means was one of these patients. When Ms. Means was 18 weeks pregnant, her water broke unexpectedly. She repeatedly sought help from the sole hospital in her county, CHM-governed Mercy Health Partners ("MHP"). Instead of abiding by the applicable standard of care and assisting Ms. Means with the completion of her miscarriage, MHP failed to provide her with the necessary treatment and information. An MHP administrator later explained that the hospital acted in that manner because of the Directives that CHM adopted. Ms. Means has therefore filed this negligence action against the CHM Defendants to redress the harm she incurred because of their policies.

Contrary to the CHM Defendants' argument that they cannot be held liable because they were not personally involved in patient care, Michigan and multiple other jurisdictions have long recognized claims of negligence against hospitals, management companies, boards of directors, and other similar entities based on patient injuries that result from institutional policies. Such

1

claims exist separate and apart from malpractice actions and stem from the bedrock tort principle that individuals who undertake a duty, such as promulgating hospital policies, are obligated to exercise that duty with reasonable care. Ms. Means has adequately alleged that the CHM Defendants failed in this regard.

The CHM Defendants' other arguments also lack merit. The Michigan statutes that insulate from liability those who refuse to provide abortions or fail to give "advice" about abortion do not apply to situations involving miscarriages, such as the one here. Any other reading of these statutes would lead to the absurd result of hospital immunity from *any* liability in emergency situations involving miscarriages and related procedures, even if it intentionally lets a patient die.

The CHM Defendants' claim that this Court lacks jurisdiction under the church autonomy doctrine must also be rejected. That doctrine is triggered in cases involving disputes between a church and its parishioners or employees, and where the court would need to resolve questions of church doctrine to adjudicate the substantive legal claim. This is inapplicable here where the CHM Defendants oversee the running of a hospital -- not a church -- by setting hospital policy on the provision of health care, a secular endeavor. Moreover, this case can be decided upon purely secular grounds, namely tort law, without impinging on church doctrine. As a result, the CHM Defendants' motion to dismiss must be denied.

## FACTS

I.     **Ms. Means Suffered Harm After Seeking Treatment at a Hospital that Adhered to Policies Adopted by the CHM Defendants.**

On December 1, 2010, when Ms. Means was only 18 weeks pregnant, her water broke and she began having contractions. Compl. ¶¶ 13, 16. She immediately went to the only hospital in her county, Mercy Health Partners ("MHP") -- a CHM-governed hospital in

Muskegon, Michigan.  *Id.* ¶¶ 14-15.  Upon arrival, Ms. Means was given an ultrasound.  *Id.* ¶¶16, 19.   Ms. Means was also diagnosed with preterm premature rupture of membrane.  *Id.* ¶ 18.  She was then given medicine, discharged from the hospital, and told to return to the hospital for her regularly scheduled doctor's visit, ***eight*** days later.  *Id.* ¶¶ 25-26.

Ms. Means was not informed that because her water had broken at such an early stage in her pregnancy, there was virtually no chance of fetal survival, and a high likelihood of risk to her health if she continued the pregnancy.  *Id.* ¶¶ 21-22.  The hospital also never told Ms. Means that completing the miscarriage by terminating the pregnancy was the safest course per the applicable standard of care.  *Id.* ¶ 22.

While at home, Ms. Means was in such severe pain that she was generally unable to eat or sleep.  *Id.* ¶ 31.  Ms. Means also started bleeding and running a fever.  *Id.* ¶¶ 32-33.  Seeking help, Ms. Means returned to MHP the next morning.  *Id.* ¶ 32.  Although the physician who examined Ms. Means already suspected that she had a significant infection, Ms. Means was sent home again without appropriate medical care or even any information about her condition or available treatment options.  *Id.* ¶¶ 34-36, 38.

Ms. Means returned to MHP that evening, still in extreme pain.  *Id.* ¶ 41.  MHP again prepared to discharge her without providing appropriate medical care or information about her condition or treatment options.  *Id.* ¶ 42.  As MHP staff prepared the discharge paperwork, the feet of Ms. Means' fetus breeched her cervix and she began to deliver.  *Id.* ¶ 43.  The baby died a few hours later.  *Id.* ¶ 45. The placental pathology report revealed that Ms. Means had contracted two significant infections after her water broke that threatened her health. *Id.* ¶¶ 47-49.

## II.    The CHM Defendants' Negligent Acts Caused Ms. Means' Injury.

Defendant Stanley Urban is the current chair of Catholic Health Ministries ("CHM"), *id.* ¶ 73, and Defendants Robert Ladenburger and Mary Mollison were the Chairs of CHM in 2010 and 2009, respectively, *id.* ¶¶ 80-81.  Because CHM is not incorporated, its members, including Defendants Urban, Ladenburger and Mollison, are CHM's representatives for the purposes of litigation and are liable for the decisions CHM made during their membership.  *See* Mich. Comp. Laws § 600.2051(2).

CHM is the unincorporated association that governs Trinity Health, a healthcare system headquartered in Michigan that operates multiple hospitals, including MHP.  Compl. ¶¶ 82, 88, 91-92.  Trinity Health's corporate documents state that its board of directors will be composed of the same individuals who are members of CHM.  *Id.* ¶ 93.  Thus, each CHM member, including each individual CHM Defendant, is also a member of Trinity's Board of Directors for the duration of their CHM membership.

As the governing entity of the healthcare system of which MHP is a part, CHM has the authority to set policies for MHP, such as hospital protocol related to the provision of health care, including pregnancy termination.  *Id.* ¶¶ 91, 116.  Pursuant to this authority, CHM made the decision that MHP would adhere to the Ethical and Religious Directives for Catholic Health Care Services ("Directives") -- a set of healthcare policies drafted by co-defendant United States Conference of Catholic Bishops.  *Id.* ¶¶ 11, 60.  In 2009, Defendant Mollison implemented this decision when she signed CHM's amended by-laws that require the hospital system within its control, Trinity Health, to follow the Directives.  *Id.* ¶ 86.  In turn, that same year, Trinity Health amended its articles of incorporation to require its hospitals, including MHP, to conduct its activities "in a manner consistent with" the Directives.  *Id.* ¶ 91-92

The Directives state that an abortion -- which it broadly defines as "the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus" -- "is never permitted." *Id.* ¶ 67. The Directives do not contain an exception for miscarriages. *Id.* ¶ 57. These policies further state that abortion services are not to be provided, "even based upon the principle of material cooperation." *Id.* Under these rules, MHP physicians and other staff members may not assist in the termination of a pregnancy even in situations where a woman is miscarrying and completing the miscarriage by terminating the pregnancy is necessary to protect a patient's health. *Id.* ¶¶ 68, 115. These Directives also do not allow MHP employees to inform patients about the availability of and/or need for pregnancy termination even when failure to provide this information places the pregnant woman at risk of harm. *Id.* ¶ 69.

In 2013, a public health researcher working on a federally funded public health project on infant and fetal mortality discovered that MHP had not induced labor and terminated the pregnancy for several women who were in the process of miscarrying and had been diagnosed with preterm premature rupture of membrane. *Id.* ¶ 54. Ms. Means was one of those women. *Id.* ¶ 56. When the researcher discussed this issue with an MHP administrator, the administrator told the researcher that MHP's actions were proper because the Directives prohibited MHP from caring for Ms. Means and assisting her with the completion of her miscarriage. *Id.* ¶ 57.

**ARGUMENT**

When considering a 12(b)(6) motion to dismiss, a court must "construe the complaint in a light most favorable to [the plaintiff] and accept all of her factual allegations as true." *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). This type of motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Id.* (citing *Golden v. City of Columbus,* 404 F.3d 950, 958-59 (6th Cir. 2005)). Therefore, "as

long as a court can 'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 817, 821 (E.D. Mich. 2014) (citing *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 281 (6th Cir. 2010)). For the reasons set forth below, Ms. Means has satisfied that standard.

## I. Ms. Means Has Adequately Pled a Direct Liability Claim Against the CHM Defendants for Independent Negligence.

A plaintiff has stated a claim for negligence under Michigan law[1] if he or she alleges "that: (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached or violated the legal duty, (3) the plaintiff suffered damages, and (4) the breach was a proximate cause of the damages suffered." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (internal quotations omitted) (citing *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993)). Ms. Means' Complaint more than adequately makes out such a claim.

### A. Under Michigan Law, Individuals and Institutions Are Subject to Tort Liability for Claims that Arise Out of Hospital Policies and Procedures.

As the Michigan Supreme Court has made clear, entities that set policies governing the delivery of health care owe a duty to patients and may be liable for "independent negligence," as distinct from malpractice or vicarious liability, based on harm to plaintiffs caused by policies and procedures created or implemented by the entity. *Theophelis v. Lansing Gen. Hosp.*, 424 N.W.2d 478, 480 n.3 (Mich. 1988) (opinion of Griffin, J.); *Cox ex rel. Cox v. Bd. of Hosp.*

---

[1] Ms. Means filed a negligence claim in this Court on the basis of diversity jurisdiction. As a result, Michigan law applies. *See Allred v. Broekhuis*, 519 F. Supp. 2d 693, 695 (W.D. Mich. 2007).

*Managers for Flint*, 651 N.W.2d 356, 361-62 (Mich. 2002).[2] Such a claim may lie against the hospital, its board of directors, or any other affiliated entity acting "during the scope of corporate activity." *See Theophelis*, 424 N.W.2d at 480 n.3.[3]

This is in accord with the law of multiple other jurisdictions. As the Texas Court of Appeals has explained:

> A hospital or a corporate health care provider may be liable for injuries arising from the negligent performance of a duty that the hospital or corporate health care provider owes directly to a patient. One such duty is the duty to use reasonable care in formulating the policies and procedures that govern the hospital's medical staff and nonphysician personnel.

*Chesser v. LifeCare Mgmt. Servs.*, L.L.C., 356 S.W.3d 613, 629 (Tex. Ct. App. 2011) (citations omitted); *see also Armstrong v. A.I. Dupont Hosp. for Children*, 60 A.3d 414 (Del. Super. Ct. 2012) (denying motion to dismiss independent negligence claim on behalf of hospital and its foundation for failing to adopt appropriate policies consistent with the standard of care); *Barkes v. River Park Hosp.,* 328 S.W.3d 829 (Tenn. 2010) (upholding jury verdict finding hospital independently liable for failing to implement system of oversight and enforcement of its policies); *Corleto v. Shore Mem'l Hosp.*, 350 A.2d 534 (N.J. Super. Ct. 1975) (allowing independent claim to proceed against hospital and its board of directors based on negligent supervision of staff); *cf. Broder v. Corr. Med. Servs.,* No. 03-75106, 2008 WL 704229 (E.D.

---

[2] Because CHM is not a "licensed health care professional" or "licensed health facility or agency" under Mich. Comp. Laws § 600.5838a(1), it cannot be sued for medical malpractice and claims of direct liability against it properly sound in negligence. *See Kuznar v. Raksha Corp.*, 750 N.W.2d 121, 126-28 (Mich. 2008); *Potter v. McLeary*, 774 N.W.2d 1, 3 (Mich. 2009) ("Claims asserted against providers and facilities not delineated in § 5838a sound in ordinary negligence.").

[3] *See also Martin v. Hardy*, 232 N.W. 197, 197-98 (Mich. 1930) ("Directors must answer for ordinary neglect . . . The plain and obvious rule is that directors impliedly undertake to use as much diligence and care as the proper performance of the duties of their office requires.") (internal citations omitted).

Mich. Mar. 14, 2008) (denying motion to dismiss constitutional claim against prison medical director for devising and implementing medical policies).

For example, in *Chesser,* the court upheld a jury finding of negligence against a hospital management company, that like CHM, was responsible for setting policy at the hospital. *Id.* at 633-35. According to the court, the management company had a "duty to create policies, procedures, bylaws, rules, and regulations that govern [the] Hospital." *Id.* at 631. As a result, the jury could have found the management company liable for negligence for "failing to do that which a long-term acute care hospital management company of ordinary prudence would have done under the same or similar circumstances." *Id.* at 633-34.

This principle is also illustrated in Michigan cases outside of the healthcare context. In *Roberts v. Bennett Enterprises, Inc.*, No. 04-73540, 2006 WL 3825067 (E.D. Mich. Dec. 26, 2006), a plaintiff who, along with his family, was a guest at a Holiday Inn franchise hotel, brought a negligence claim against both the franchisee-owner of the hotel and the out-of-state franchisor corporation. The negligence claim was based on injuries that the plaintiff's son incurred due to the temperature of the hotel bath water, which was set based on the franchisor's operating standards. The franchisor argued for summary judgment on the negligence claim because it did not have "day-to-day control over the operations" of the franchisee. *Id.* at *4. The court found that general lack of control was immaterial because the plaintiff's "issue is with the actual standards set forth by the franchisor . . . not how those standards are carried out on a day-to-day basis by a franchisee." *Id.* at *5. Because the franchisor "retained control" over the general policy of hotel room water temperature and the franchisee did not have "independence" to alter the temperature specifications, the court found a genuine issue of material fact existed regarding the franchisor's negligence. *Id.* at *5-8.

As these cases make clear, where an institution implements operating policies for an affiliated entity and a third party is injured as a result, it is appropriate for the injured party to bring a negligence claim against the policy-making institution. *See Roberts*, 2006 WL 3825067 at *8. This is precisely what Ms. Means has done here. Ms. Means alleges that she was not provided the safest course of treatment (termination of pregnancy) for her miscarriage, or even informed that the option existed and the risks of not doing so, because the hospital's operating policy -- the Directives -- prohibited that course of action. Compl. ¶ 57. Plaintiff further alleges that CHM implemented the Directives as MHP policy "during the scope of its corporate activity," *Theophelis*, 424 N.W.2d at 480 n.3 ; *see* Compl. ¶¶ 86-89, 95, and that MHP was required by CHM to follow the Directives, thereby lacking the independence to deviate from those policies, *see Roberts*, 2006 WL 3825067 at *6; Compl. ¶ 95. This allegation is supported by CHM's own documents that state it will adhere to the Directives, Compl. ¶ 86, as well as Trinity Health's corporate documents which state the corporation (which includes MHP) will follow the "directives promulgated from time to time by Catholic Health Ministries," *id.* ¶ 92. Under Michigan law "any unincorporated voluntary association having a distinguishing name may sue or be sued in its partnership or association name, **or in the names of any of its members designated as such** or both." Mich. Comp. Laws § 600.2051(2) (emphasis added). The CHM Defendants can therefore properly be sued for the policy-making acts of CHM.

The CHM Defendants' contrary arguments fundamentally misunderstand the direct liability independent negligence claim that Plaintiff has brought. In an effort to avoid this line of cases, the CHM Defendants set up a series of straw men in an attempt to show that they did not owe Ms. Means a duty of care under a variety of theories, ***other than the one she alleged***. First, the CHM Defendants argue that no duty exists because they do not have a special

relationship with Ms. Means. *See* Defs.' Br. in Supp. of Mot. Dismiss, at 4, April 23, 2015 ("Defs.' Br."). But Ms. Means does not argue that a special relationship created the duty. Ms. Means' claim is premised upon CHM's duty to exercise reasonable care when setting and adopting policies for its affiliated hospitals. *See Theophelis*, 424 N.W.2d at 480 n.3; *Chesser*, 356 S.W.3d at 629. As the Sixth Circuit explained in a decision applying Michigan law, when the plaintiff's claim is not that the defendant failed to protect her from third-party negligence but rather that the *defendant's own negligence* was responsible for the injury, the special relationship test is not invoked. *See Rupert v. Daggett*, 695 F.3d 417, 424 (6th Cir. 2012). Therefore, Ms. Means need only demonstrate that the CHM Defendants owed her a duty of care, not the existence of a special relationship. *Id.* The cases cited above establish that courts routinely allow injured hospital patients to proceed with negligence claims against various institutions based on their role in setting hospital policies. *See, e.g.*, *Theophelis*, 424 N.W.2d at 480 n.3; *Ware v. Bronson Methodist Hosp*., No. 307886, 2014 WL 5689877 (Mich. Ct. App. 2014). In so doing, these cases recognize there is a duty of care on the part of the policymaker to the patient whose care was governed by its policies -- in this case, a duty by the policy-making CHM Defendants to Ms. Means.

Second, contrary to the CHM Defendants' bald assertion, Ms. Means has not pled a negligence claim of "nonfeasance" on the grounds that the CHM Defendants failed to protect her from the harmful acts of MHP staff members. *See* Defs.' Br. 5. Plaintiff has alleged affirmative negligent conduct based on the harmful policies Defendants themselves implemented. *See Theophelis*, 424 N.W.2d at 480 n.3; *Roberts*, 2006 WL 3825067 at *8. As such, the cases cited by the CHM Defendants discussing a party's non-liability for failure to protect against third-party misconduct are inapposite. Moreover, the nonfeasance/misfeasance distinction that the

CHM Defendants rely upon is a principle that is utilized "for tort claims based on a defendant's contractual obligations." *See Zanke-Jodway v. City of Boyne City*, No. 1:08–cv–930, 2009 WL 3205969, at *31 (W.D. Mich. Sep. 28, 2009). It is thus inapplicable in the instant negligence claim that arises out of hospital policies, not a contract.[4]

Finally, Ms. Means has not argued that the CHM Defendants' duty is created by a statute. *See* Defs' Br. 12-14. The Michigan Supreme Court has explained that "[t]he fact that a person has violated a safety statute may be admitted as evidence bearing on the question of negligence." *Klanseck v. Anderson Sales & Serv., Inc*., 393 N.W.2d 356, 359 (Mich. 1986); *see also Abnet v. Coca-Cola Co.,* 786 F. Supp. 2d 1341, 1345 (W.D. Mich. 2011) ("Plaintiffs may offer evidence of statutory violations to establish a *prima facie* case under their claim of negligence."). In line with this reasoning, Ms. Means has alleged that the CHM Defendants' blanket policy against providing assistance with pregnancy termination, including miscarriage treatment in her situation, is directly contrary to state and federal laws, such as the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which "requires a hospital to treat a patient with an emergency condition in such a way that, upon the patient's release, no further deterioration of the condition is likely." *Moses v. Providence Hosp. & Med. Ctrs.*, 561 F.3d 573, 582 (6th Cir. 2009); *see also* 42 C.F.R. § 482.13(b)(2) (requiring hospitals to give patients "the right to make informed decisions regarding his or her care . . . include being informed of his or her health status"). Ms. Means contends that these statutory violations are evidence of the CHM Defendants' negligence, not that those laws themselves create a particular duty. Compl. ¶ 117. As explained above, that duty is already well-established in common law.

---

[4] Even if this were a contract matter "courts should not permit the contents of the contract to obscure the threshold question of whether any independent legal duty to the noncontracting third party exists, the breach of which could result in tort liability." *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 561 (Mich. 2011).

**B. Ms. Means' Allegations of Proximate Causation Are Sufficient to Survive a 12(b)(6) Motion to Dismiss.**

In her Complaint, Ms. Means alleges that by setting healthcare policies that prevented MHP from providing appropriate medical care to her while she was miscarrying, the CHM Defendants caused her to suffer a breech delivery, become infected and incur severe emotional and physical trauma.

Negligent conduct is a proximate cause of a plaintiff's injury when it is both the cause of the injury and the "natural and probable result of the negligent conduct." *O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 858 (Mich. 2010). The Michigan Supreme Court has made clear that it is not necessary for a plaintiff to show that the defendant's conduct was the sole cause of the plaintiff's injury; "the proper standard is . . . that the negligence must be '*a* proximate cause' not '*the* proximate cause.'" *Id.* at 859 (citing *Kirby v. Larson*, 256 N.W.2d 400, 410 (Mich. 1977)) (emphasis added). "[I]it is well-established that there can be more than one proximate cause contributing to an injury." *Id.* at 858.

Unlike duty, proximate cause is typically a question of fact to be decided by the jury. *Transp. Dep't v. Christensen*, 581 N.W.2d 807, 811 (Mich. 1998). Only when "reasonable minds could not differ regarding the proximate cause of the plaintiff's injury" should the court decide the issue as a matter of law. *Id.*

The instant Complaint does not present one of those rare situations where "reasonable minds could not differ." Here, Ms. Means has alleged that the hospital she went to withheld necessary treatment and information regarding her miscarriage because it was required to do so by the policies written by USCCB and adopted by the CHM Defendants to control the provision

of certain types of health care at MHP. Compl. ¶ 57. Ms. Means has further alleged that the

withholding of treatment and information pursuant to these policies caused her infection and

other injuries. *Id.* ¶58. These allegations provide the requisite causal link between the CHM

Defendants' conduct and Ms. Means' injury.

The CHM Defendants erroneously contend that causation in this instance is a question of

law for the court to decide because the negligent acts of MHP were an intervening cause of Ms.

Means' harm, and it did not have prior knowledge of the harm posed by the Directives. With

respect to the first contention, the law is clear -- intervening negligent acts by third parties do not

automatically immunize an initial tortfeasor from liability, and whether such acts do bar recovery

is a question for the jury, not grounds for a motion to dismiss. Indeed, the Michigan Court of

Appeals "has soundly rejected the notion that intervening negligence eliminates proximate

causation by an initial tortfeasor." *Ykimoff v. Foote Mem'l Hosp.*, 776 N.W.2d 114, 144 (Mich.

Ct. App. 2009). Elaborating, that court explained:

> An act of negligence does not cease to be a proximate cause of the injury because
> of an intervening act of negligence, if the prior negligence is still operating and
> the injury is not different in kind from that which would have resulted from the
> prior act . . . An intervening cause is not an absolute bar to liability if the
> intervening event is foreseeable, though negligent or even criminal.

*Id.* (internal citations omitted); *see also Rupert*, 695 F.3d at 426 (stating that "[w]hile an

act of God or the gross negligence or intentional misconduct by the victim or a third party

will generally be considered a superseding cause, *ordinary* negligence by the victim or a

third party will not be regarded as a superseding cause because ordinary negligence is

reasonably foreseeable") (internal citations omitted). Further, the Sixth Circuit, interpreting

Michigan law, has explicitly stated that "[w]hether an intervening negligent act of a third

person constitutes a superseding proximate cause is a question for the jury." *Rupert*, 695 F.3d at

426 (quoting *Ykimoff*, 776 N.W.2d at 133).

Regarding the CHM Defendants' second argument, there is simply no legal basis for the unprecedented argument that a tortfeasor must have prior knowledge of the harmful results of its conduct in order to be deemed liable. If that were the case, the first party injured by a tortfeasor's negligent act would never have legal recourse. The law does not give the CHM Defendants a free pass to injure Ms. Means. Indeed, the case cited by the CHM Defendants to support this notion is wholly inapposite. *See* Defs.' Br. 15 (citing *Murday v. Bales Trucking, Inc.*, 419 N.W.2d 451 (Mich. Ct. App. 1988)). That case did not discuss the requirement of prior knowledge in the context of a negligence claim, but rather the attractive nuisance doctrine and the circumstances under which a landowner can be held liable for injuries incurred by a trespassing child. Under the Restatement of Torts 2d, § 339, prior knowledge is an element to an attractive nuisance claim. *See Murday*, 419 N.W.2d at 453-54 . No similar requirement, however, exists for negligence claims such as the one brought by Ms. Means here.

Thus, contrary to the CHM Defendants' assertion, the appropriate proximate cause analysis for the jury is not whether the CHM Defendants had prior knowledge of the precise injuries suffered by Ms. Means "but whether the patient's injuries and damages arising from the [hospital policy] qualify as a 'natural and probable result of' the defendant's negligent conduct." *Lockridge v. Oakwood Hosp.*, 777 N.W.2d 511, 518 (Mich. Ct. App. 2009) (citing Mich. Model Civ. Jury Instruction 15.01). This has been adequately alleged by Ms. Means. The Complaint avers that "CHM required Trinity Health and its affiliated hospitals, including MHP, to adhere to Defendant USCCB's Directives." Compl. ¶ 113. The Complaint further alleges that the Directives prohibited MHP from providing a patient who is already in the process of miscarrying with treatment or information about pregnancy termination even when continuing the pregnancy places a woman's health at risk. *Id.* ¶¶ 68, 70. Assuming, as one must at the 12(b)(6) stage, that

these allegations are true, a reasonable factfinder could conclude that when the CHM Defendants set these policies and required MHP to adhere to them, it was natural and probable, or foreseeable, that MHP would in fact adhere to them and that doing so would foreseeably compromise patient care and result in harm (as it did here). Indeed, the Complaint alleges that after the harm to Ms. Means occurred, an MHP hospital administrator stated that MHP's actions were proper because the Directives prohibited MHP from assisting Ms. Means with the completion of her miscarriage. *Id.* ¶ 57. Thus, the CHM Defendants cannot seek dismissal of Ms. Means' suit on these grounds.[5][6]

## II.     The Michigan Refusal Statutes Cannot Shield the Individual Defendants From Liability in the Context of Emergency Treatment of Miscarriage.

The CHM Defendants argue that they are shielded from liability under two Michigan statutes that allow hospitals and physicians to refuse to provide abortions or to give abortion "advice." Defs.' Br. 15-16. But those statutes were never intended to apply to hospitals that refuse to provide emergency treatment and information to a patient who is in the process of experiencing a miscarriage, particularly where the failure to provide treatment places the woman's health in jeopardy. That is precisely what is at issue here: At 18 weeks pregnant, Ms. Means began to experience a spontaneous abortion, commonly referred to as a miscarriage, and sought emergency care from MHP. She was in extreme pain, had a serious infection, and the

---

[5] Because the CHM Defendants have not contested the adequacy of Ms. Means' allegations in regard to breach and injury, they have conceded the sufficiency of those allegations and she is not required to establish these elements. *See Dawson v. Norwood*, No. 1:06–cv–914, 2011 WL 2667962, at * 2 (W.D. Mich. July 5, 2011). Nonetheless, the Complaint's allegations, viewed in the light most favorable to Ms. Means, clearly establish that both elements are adequately pled.

[6] On the final page of their brief, the CHM Defendants raise one last straw man and claim that Plaintiff seeks relief on behalf of third parties. Defs.' Br. at 20. Plaintiff has made no such assertion. Therefore, the CHM Defendants' argument is wholly inapplicable to this case.

pregnancy was doomed.  As a matter of statutory construction and public policy, the Michigan refusal statutes cannot be read to insulate the CHM Defendants from liability in this case based on these facts.

Indeed, when read in harmony with other state and federal statutes, it is clear that the Michigan refusal statutes create an exception for emergencies like the one Ms. Means experienced.  This is demanded by the statutory requirement within the chapter where the refusal statutes are housed:  that statutory chapter has an explicit "construction and application" provision that requires the refusal statutes to be "liberally construed for the protection of the health, safety, and welfare of the people of this state," and must be construed "to achieve consistency" with "applicable federal and state law."  Mich. Comp. Laws § 333.1111.  So construed, neither statute can protect the CHM Defendants from liability in this case.

The first statute the CHM Defendants rely upon grants immunity to hospitals, or anyone connected to the hospital, if they refuse to provide abortion, participate in abortion, or allow abortion to be performed on its premises.  Mich. Comp. Laws § 333.20181.  But this statute must be read in harmony with other state and federal laws that require hospitals to provide proper treatment to women seeking emergency treatment for miscarriage.  In the context of state abortion restrictions, the Supreme Court has long held that because a woman's health is paramount, the Constitution requires such restrictions to contain an exception for medical emergencies.  *See, e.g., Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 327-28 (2006) (holding that law requiring parental notification prior to an abortion must have an emergency exception and that the Court's "precedents hold [] that a State may not restrict access to abortions that are necessary" to preserve the life or health of the pregnant woman).  In addition, federal law, specifically EMTALA, requires hospitals to screen and stabilize all

patients who seek emergency medical care, even if that care is termination of the pregnancy. *See supra* at 11; *see also Moses*, 561 F.3d at 582-84 (recognizing that EMTALA requires a hospital to treat a patient with an emergency condition in such a way that, upon the patient's release, no further deterioration of the condition is likely). And state law requires hospitals to provide patients with "adequate and appropriate care." Mich. Comp. Laws. § 333.20201(1)(e). These statutes establish that a hospital is not allowed to refuse to take action if a patient would be endangered, even when the action involves abortion.[7] Further, it is well-settled that when statutes are in "tension, or even conflict" the statutes should be harmonized so "as to give meaning to each." *Nowell v. Titan Ins. Co.*, 648 N.W.2d 157, 160 (Mich. 2002). Therefore, the refusal statute upon which the CHM Defendants rely must be construed to be consistent with state law and EMTALA, such that immunity is not granted for a refusal to provide emergency care to women, like Ms. Means, who are experiencing a miscarriage.[8]

The CHM Defendants' other argument -- that they are shielded from liability for refusal to provide "advice" about abortion, Mich. Comp. Laws § 333.20183 -- fails as well. When Ms.

---

[7] Carving out emergencies from the state refusal statute is consistent with the interpretation of federal refusal law. For example, the federal Weldon Amendment prohibits the government from discriminating against health care entities that refuse to provide or refer for abortion. Consolidated Appropriations Act, Pub. L. No. 111-117, 123 Stat. 3034 (2009). However, when promulgating the Weldon Amendment, the sponsor, Representative Weldon, said that it was not designed to override EMTALA, and that the two statutes should be read together in harmony. *See* 151 Cong. Rec. H176-02 (Jan. 25, 2005) ("The Hyde-Weldon Amendment is simple. It prevents federal funding when courts and other government agencies force or require physicians, clinics, and hospitals and health insurers to participate in *elective* abortions.") (emphasis added); 151 Cong. Rec. H177 (Jan. 25, 2005) ("Congress passed the Federal Emergency Medical Treatment and Active Labor Act (EMTALA) forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients - particularly pregnant women.") (statement of Rep. Weldon).

[8] If the refusal statute is not construed in this manner, the preemption doctrine would be implicated. Indeed, where, as here, state law authorizes what federal law forbids, the state law is an obstacle to achieving Congress' purpose, and is therefore preempted. *See, e.g., Michigan Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 469 (1984).

Means went to the hospital in an emergency while experiencing a miscarriage, she was denied proper information both about her condition and her treatment options. ***But information about her medical condition (for example, that her fetus had no chance of survival and that she was at risk of developing a severe infection that could jeopardize her health, and even life) cannot be considered "abortion advice" under the statute.*** Nor can a non-directive, neutral presentation of treatment options, including that Ms. Means' options included pregnancy termination. To the contrary, the term "advice" is typically akin to a "recommendation." *See* Oxford Dictionaries (online ed. 2015), *available at* http://www.oxforddictionaries.com/us/definition/american_english/advice. Moreover, the state refusal statute cannot be read to authorize medical personnel to withhold critical information from a pregnant woman in a medical emergency. If it were, it would conflict with state and federal laws that ensure that hospitals provide patients with information and treatment options when facing risks to their health. For example, Michigan law requires all hospitals to provide patients with information about their medical condition, proposed course of treatment, and prospects for recovery. Mich. Comp. Laws § 333.20201(1)(e). And federal law, the Conditions of Participation, require hospitals to inform patients of their health status, and involve them in care planning and treatment. 42 C.F.R. § 482.13(b)(2); *see supra* at 11. The refusal statute must be read together with those statutes, and therefore immunity should not be granted to hospitals that withhold information about a patient's condition and her treatment options in an emergency, which is precisely what happened here. *See supra* at 16.

Taken to its logical conclusion, the CHM Defendants' position would mean that hospitals could let a woman experiencing a miscarriage die by refusing to provide a life-saving abortion or even providing information about all possible treatment options, without facing *any* liability

whatsoever.  This cannot be what the law is intended to allow.  Instead, both refusal statutes can, and indeed must, be construed to protect the "health, safety, and welfare" of patients.  Mich. Comp. Laws § 333.1111(2).

**III.    The Church Autonomy Doctrine Is Inapplicable in This Case.**

Although the CHM Defendants claim that this Court lacks jurisdiction to hear Ms. Means' claims under the church autonomy doctrine, there is no question that this case involves the substandard medical care that Ms. Means received, not the inner workings of a church. Accordingly, the church autonomy doctrine does not apply.  That doctrine bars civil courts from resolving disputes involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required by them." *Watson v. Jones*, 80 U.S. 679, 733 (1871).  Those types of issues are not present in this case, which involves the administration of a hospital that serves people of all faiths, and a patient who was injured as a result of hospital policy.  Here, the "disputed issues can be resolved through application of secular standards without any impingement upon church doctrine or practice." *Ogle v. Hocker*, 279 Fed. App'x 391, 396 (6th Cir. 2008).  Indeed, the question in this case is whether the CHM Defendants adopted a hospital policy that caused Ms. Means' injuries; and that question can be decided based on secular tort law without any interference with church doctrine.  Accordingly, the CHM Defendants' motion to dismiss on this ground should be denied.

At the outset, what's at issue in this case is the CHM Defendants' role in setting policy for the operation of a hospital, which provides health care to people of all faiths, and employs people of all faiths, and is heavily regulated under secular state and federal law.  This is in sharp contrast to the church autonomy cases that involve disputes between houses of worship and their

parishioners or employees.[9]  In those cases, the parishioners and employees gave their implicit

consent to be bound to churches' internal policies and religious doctrine.  *See, e.g.*, *Watson*, 80

U.S. at 729 (noting that "[a]ll who unite themselves" in a church "do so with an implied consent"

to be bound by church doctrine).  But running a church is different than running a hospital.

Indeed, Ms. Means is not a church employee or parishioner, but rather is a member of the public

who sought a secular service -- emergency medical care -- and has brought a secular legal claim

after being mistreated as a result of the hospital policies set by the CHM Defendants.  Ms. Means

was not aware of the Directives, and certainly did not consent to be bound by them.  This is a far

cry from cases like disputes between warring factions of a church or suits involving the hiring

and placement of members of the clergy cited by Defendants, *see supra* n.8, where the church

autonomy doctrine was designed to apply.

     But even in the context of disputes between churches and their parishioners or

employees, the church autonomy doctrine does not apply if the dispute can be resolved by

principles of secular law.  For example, the Sixth Circuit in *Ogle* refused to apply the church

autonomy doctrine in a defamation case between two bishops, despite the fact that the

defamatory comments arose in a sermon.  The court held that reviewing the contents of the

sermon was appropriate because the sermon at issue did not involve issues related to polity but

rather contained secular cautionary tales.  *Ogle*, 279 Fed. App'x at 396.  The court noted that the

"relevant question before us is whether the court would interfere with any matters of church

doctrine or practice by ruling on this case."  *Id*.  The court reasoned that there would be no such

---

[9] *See, e.g.,* Defs.' Br. 16-19 (citing *Serbian E. Orthodox Diocese for the U.S. and Can. v. Milivojevich*, 426 U.S. 696 (1976) (holding that the Court lacked jurisdiction over claim involving, *inter alia*, a defrocked bishop because the Constitution permits churches to establish their own rules for internal discipline)); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) (holding that the Court lacked jurisdiction to hear property dispute over use and occupancy of a church between two factions of the church).

"interference" because the case did not present questions of whether the plaintiff's actions complied with church law or whether the defendant's statements were supported by doctrine. Rather, the court held that the claim could proceed because the "disputed issues can be resolved through application of secular standards without impingement upon church doctrine or practice." *Id*.

Similarly, the Second Circuit held that the church autonomy doctrine was not implicated in a case against a Catholic Diocese for its role in covering up sexual abuse by one of the Diocese's priests. *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999). The court held that the doctrine was not triggered because the jury was not asked to resolve any "disputed religious issue," despite the fact that it needed to determine, as a matter of fact, whether religious tenets gave rise to a fiduciary relationship between the victim of the sexual abuse and the Diocese. *Id*. at 431. The court reasoned that "a proposition advanced by a particular religion . . . cannot be considered [by a jury] to assess its truth or validity or the extent of its divine approval or authority, but may be considered by the same jury to determine the character of the relationship between a parishioner and his or her bishop." *Id*. The court noted that there is an "obvious distinction between the proper use of religious principles as fact and improper decision that religious principles are true or false." *Id*. Ultimately, the court concluded that the plaintiff's claim could proceed because it was brought under secular law, not church law, and the plaintiff's claim "neither relied upon nor sought to enforce the duties of the Diocese according to religious beliefs, nor did it require or involve a resolution of whether the Diocese's conduct was consistent with them." *Id*.

These principles apply with equal force here. Indeed, Ms. Means is not asking the Court to determine the validity of the Directives, whether the Directives comport with religious

teaching, or whether the CHM Defendants' actions complied with church law. Rather, the

question in this case is whether, as secular matter, the CHM Defendants' imposition of the

Directives on MHP caused Ms. Means to suffer harm. Simply put, the tort analysis is not

affected by the fact that the Directives are based on Catholic doctrine. The Court's legal analysis

would be the same if the CHM Defendants had imposed the same policy for secular reasons.[10]

Thus, because this case can be resolved through application of secular standards, namely tort

law, the church autonomy doctrine is not implicated. *Gen. Conference Corp. of Seventh-Day

Adventists v. McGill*, 617 F.3d 402, 408 (6th Cir. 2010) (holding that church autonomy doctrine

did not apply in trademark dispute, which did not require the court to decide matters of doctrine

but rather to apply neutral principles of trademark law); *see also Presbyterian Church in the U.S.

v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449 (1969) (holding that

civil courts may use "neutral principles of law" in deciding church disputes); *Isely*, 880 F. Supp.

at 1151 (rejecting church autonomy doctrine in negligent supervision claim because the claim

could be decided without "determining questions of church law and policies"); *Malicki v. Doe*,

814 So.2d 347, 361 (Fla. 2002) (applying neutral principles of tort law to religious organizations,

and holding that the court would grant "no greater or lesser deference to tortious conduct

committed on third parties by religious organizations" than those committed by non-religious

organizations).

---

[10] Indeed, religious motivation for an otherwise improper act cannot insulate a party from liability. For example, in *Lundman v. McKown*, cited by Defendants, the Minnesota Supreme Court allowed Christian Scientist healers to be sued in a wrongful death action after they let an 11-year-old boy die of diabetes. Based on the healers' religious opposition to traditional medicine, they only prayed with the boy, and did not call 911 until after he died. The court held that the Christian Scientist healers could be sued for wrongful death, noting that they were "free to believe what they will — and to teach and preach what they believe. But, when beliefs lead to conduct, the conduct is subject to regulation. Here, regulation is necessary for the protection of children and [the healers'] conduct, though rooted in religion, is subject to state regulation." 530 N.W.2d 807, 818 (Minn. 1995).

The mere fact that the Court will need to read the Directives to analyze the tort claim does not change this conclusion. *Jones v. Wolf*, 443 U.S. 595, 602-604 (1979). Indeed, courts are permitted to review religious documents and scrutinize them "in purely secular terms" to decide the underlying civil legal claim. *Id*. at 604. Only if the court is asked to "resolve a religious controversy" should the court refrain from relying on church documents. *Id.*; *see also Martinelli.*, 196 F.3d at 431 (holding that church autonomy doctrine did not apply merely because the jury needed to consider church doctrine to resolve the secular legal claim); *Overall v. Ascension*, 23 F. Supp. 3d 816, 825 (E.D. Mich. 2014) (taking judicial notice of Directives).[11] Here, this Court is not asked to read the Directives to "resolve a religious controversy" but rather to determine whether the CHM Defendants' acted negligently by adopting them and requiring MHP to adhere to them at the expense of patient care.

Moreover, contrary to the CHM Defendants' claim, Defs.' Br. 3 n.3, this Court does not need to "interpret" the Directives to adjudicate this case. The Directives clearly prohibit hospitals from providing direct abortion under any circumstance, including in emergencies to manage miscarriages, and from providing information about abortion. Compl. ¶¶ 65, 67. The CHM Defendants' assertion that providing information about abortion isn't prohibited by Directives is belied by terms of the Directives themselves. *See* Compl. ¶¶ 66-70 (the Directives prohibit hospitals from providing information about procedures that are not "morally legitimate," such as abortion). But even if this Court is required to interpret Directives to determine whether

---

[11] Because the church autonomy doctrine encompasses First Amendment principles, *see Kedroff*, 344 U.S. at 115-16 , courts typically do not engage in separate analyses under the Free Exercise or Establishment Clause doctrines. But if this Court did, this Court should find that there is no excessive entanglement with religion under the Establishment Clause for the same reason: This Court will not be required to interpret church doctrine or resolve an intrachurch dispute. Moreover, there is no Free Exercise concern because the tort of negligence is a neutral rule of general applicability. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990).

they prohibited MHP from providing Ms. Means with appropriate information about her miscarriage, such an interpretation doesn't require this Court to resolve any religious controversy or to examine the Directives for consistency with church teaching.  Rather, if the fact-finder needed to "interpret" them, it would merely be required to determine whether it was reasonable for CHM to foresee that MHP would rely on the Directives to refuse to provide medically appropriate information to Ms. Means, and Ms. Means has alleged that MHP did in fact rely on them in that manner.  *See, e.g.*, Compl. ¶¶ 2, 57.  Furthermore, the Directives are not scripture or ecclesiastical internal policy; rather they are an outward facing, public document, explicitly intended for a secular audience such as "physicians, health care personnel, and patients or residents" of Catholic health care institutions, and they pertain to a secular service, namely the provision of health care.  Directives at 4 (attached as Ex. B to Defs.' Br.).  Therefore, although the Court does not need to interpret the Directives to analyze the tort claim, there is even less of a risk of interference with church doctrine because of the unique nature of the Directives, compared to other cases that would have required the civil courts examine central religious tenets of faith.  *See, e.g.*, *Presbyterian Church*, 393 U.S. at 450 (holding that church autonomy doctrine applied because the courts were being asked to examine tenet of faith and determine whether one party failed to follow them).

Finally, allowing a Catholic hospital to harm members of the public without recourse would give those hospitals preferred treatment to the detriment of others, raising serious Establishment Clause concerns.  The Supreme Court has held that if the government relieves religious entities of legal obligations, the government can cross the line into an impermissible accommodation of religion; this is true particularly where, as here, third parties are burdened. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (holding that when applying the

Religious Land Use and Institutionalized Persons Act courts must take into account the burdens a requested accommodation may impose on non-beneficiaries); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985) (refusing, under the Establishment Clause, to give every employee an unfettered right to be free from work on his or her Sabbath regardless of the burden imposed on the employer and other employees). And insulating from liability religious entities that harm others -- in this case subjecting Ms. Means to a severe infection that could have led to her death -- is inappropriate and has never been sanctioned by the Court. Indeed, in rejecting the application of the church autonomy doctrine in *General Council on Finance*, Justice Rehnquist remarked that "'[nothing] we have said is intended to even remotely imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public.'" *Gen. Council on Fin.*, 439 U.S. at 1373 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940)). Accordingly, the CHM Defendants' motion to dismiss should be rejected.

## CONCLUSION

Unlike a malpractice claim where a hospital patient alleges a physician haphazardly chose the wrong course of treatment, Ms. Means claims that the substandard care she received was mandated by the policies adopted by the CHM Defendants. She has therefore properly alleged an independent negligence against them. Accordingly, for the reasons set forth above, Ms. Means respectfully requests that this Court deny the CHM Defendants' motion to dismiss.

Respectfully submitted,

| /s/Daniel S. Korobkin | /s/Brigitte Amiri | /s/Don Ferris |
|---|---|---|
| Daniel S. Korobkin (P72842) | Brigitte Amiri | Don Ferris (P26436) |
| ACLU Fund of Michigan | ACLU Foundation | Ferris & Salter PC |
| 2966 Woodward Avenue | 125 S. Broad St. | 4158 Washtenaw Ave. |
| Detroit, MI 48201 | New York, NY 10004 | Ann Arbor, MI 48108 |
| 313-578-6824 | 212-519-7897 | 734-677-2020 |

*Attorneys for Plaintiff*                                                      Dated: May 21, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2015 I filed the foregoing document through the electronic filing system and that the ECF clerk will electronically serve all counsel through the electronic filing system.

/s/ Brenda Bove           