UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMESHA MEANS,

       Plaintiff,

                                  File No. 1:15-CV-353

v.

                                  Hon. ROBERT HOLMES BELL

UNITED STATES CONFERENCE OF
CATHOLIC BISHOPS, et al.,

       Defendants.

_____/

## O P I N I O N

       This is an action for negligence brought by Plaintiff Tamesha Means against Defendants United States Conference of Catholic Bishops ("USCCB") and Stanley Urban, Robert Ladenburger, and Mary Mollison, individuals who are current or former chairs of Catholic Health Ministries ("CHM"). Plaintiff's negligence action arises out of the policies promulgated by the USCCB and adopted by the Chairs of CHM in their affiliated hospitals. Plaintiff claims the policies caused her to receive improper treatment and information regarding her miscarriage. Defendant USCCB has filed a motion to dismiss for lack of personal jurisdiction. (ECF No. 39.) Plaintiff has filed a response (ECF No. 46), and the USCCB has replied (ECF No. 47). Defendants Urban, Ladenburger, and Mollison have filed a motion to dismiss for failure to state a claim. (ECF No. 42.) Plaintiff has responded (ECF No. 48), and the CHM Defendants have replied (ECF No. 50). After scrupulously combing through the documents and filings in this case, the Court has reached inevitable legal conclusions: (1) the Court cannot exercise personal jurisdiction over Defendant USCCB, and (2) Plaintiff has failed to state a legal action that this Court can adjudicate.

## I. Background

Plaintiff Tamesha Means was about eighteen weeks pregnant when she sought emergency medical care at Mercy Health Partners ("MHP") hospital in Muskegon, Michigan, on December 1, 2010, because she was experiencing labor contractions. (Compl. ¶¶ 13-16.) MHP, who is not a party in this suit, diagnosed Plaintiff with preterm premature rupture of membrane and informed Plaintiff that the fetus was not yet viable. (*Id*. at ¶¶ 18-19.) Plaintiff alleges that MHP did not inform her of the serious risks to her health if she continued the pregnancy. (*Id*. at ¶ 21.) MHP did not discuss with Plaintiff the option of terminating her pregnancy, nor did MHP advise Plaintiff that its policy did not permit the hospital to help Plaintiff terminate the pregnancy. (*Id*. at ¶¶ 23-24.) Plaintiff returned home, believing there was a chance the fetus would become viable and she could continue her pregnancy. (*Id*. at ¶¶ 25-27.)

The following day, Plaintiff again presented at MHP with pain, bleeding, and an elevated temperature. (*Id.* at ¶¶ 32-33.) Plaintiff's treating physician suspected she had chorioamnionitis, a bacterial infection that affects the fetal membranes and amniotic fluid. (*Id.* at ¶ 38.) After Plaintiff's temperature reduced, MHP discharged Plaintiff and advised her to return to the hospital if her fever returned or if her contractions became unbearable. (*Id*. at ¶¶ 39-40.) MHP did not inform Plaintiff of a risk of injury or death if she continued her pregnancy, nor did it explain termination as an option. (*Id*. at ¶¶ 35-36.)

Plaintiff presented to MHP again that evening in extreme pain. (*Id*. at ¶ 41.) Plaintiff delivered the baby breech at approximately 12:13 am on December 3, 2010. (*Id*. at ¶¶ 44-46.) The baby died several hours later. (*Id*.) The placental pathology report indicated that Plaintiff had acute chorioamnionitis and acute funistis at the time of birth. (*Id*. at ¶ 48.)

Plaintiff alleges that the standard of medical care required MHP to inform her of health risks associated with continuing her pregnancy and treatment options, including termination of pregnancy. (*Id*. at ¶ 52.) Plaintiff says that MHP did not provide the standard of medical care because it is a Catholic hospital that adheres to Defendant USCCB's Ethical and Religious Directives ("ERDs" or "Directives"). (*Id*. at ¶ 53.) Plaintiff cites to several other instances in which MHP did not induce labor where pregnant women were diagnosed with preterm premature rupture of membrane because USCCB's Directives prohibited MHP from inducing labor in those situations. (*Id*. at ¶¶ 54-57.)

**Mercy Health Partners ("MHP") and Catholic Health Ministries ("CHM")**

Catholic Health Ministries ("CHM") is an unincorporated entity, established as a "Public Juridic Person" by the Roman Catholic Church pursuant to canon law. (Compl. ¶ 77.) Public juridic persons "are constituted by competent ecclesiastical authority so that, within the purposes set out for them, they fulfill in the name of the Church, according to the norm of the prescripts of the law, the proper function entrusted to them in view of the public good." 1983 Code C. 116, § 1. Defendants Stanley Urban, Robert Ladenburger, and Mary Mollison are current or former chairs of CHM. (Compl. ¶¶ 79-81.)

In 2000, CHM became the Catholic sponsor for the newly established healthcare system, Trinity Health Corporation. (*Id*. at ¶ 82.) Trinity Health, who is not a party in this suit, is a civil law organization incorporated under Indiana non-profit corporate law to support the work of its affiliate hospitals, including Mercy Health Partners in Muskegon, Michigan. (Compl. ¶¶ 85-88; Restated and Amended Articles of Incorporation, ECF No. 46-16, Ex. 15.) The purpose of Trinity Health Corporation is "to carry out the apostolate of Catholic Health Ministries on behalf of and as an integral part of the Roman Catholic Church in the United States." (Article II, Para. A.) Trinity

3

Health's Articles of Incorporation affirm its obligation to carry out its activity in conformity with the founding principles of CHM, the teachings of the Roman Catholic Church, directives promulgated by CHM, and the "medical moral teachings of the Church" as promulgated by the USCCB, including the Ethical and Religious Directives for Catholic Health Care Services ("ERDs"). (Article III.)

**Defendant USCCB**

The United States Conference of Catholic Bishops ("USCCB") is a non-profit civil corporation organized in 2001 under the laws of Washington, D.C. (Aff. of Linda Hunt, ¶ 16, ECF No. 39-6, Ex. E.) Its members include, *ex officio*, all Bishops, Archbishops, and Cardinals of the Roman Catholic Church in the United States. (*Id.* at ¶¶ 16, 20.) The USCCB's activities include advocating and promoting the pastoral teachings of the Roman Catholic Church in areas such as liturgy, doctrine, health care, and social welfare. (*Id.* at ¶16.) Under the Code of Canon Law, the USCCB has no authority to direct, control, oversee, or supervise Catholic entities or organizations operating within the diocese of a Bishop. (*Id.* at ¶ 25.) The USCCB has no authority over CHM, Trinity Health, or Mercy Health Partners. (*Id.* at 29.)

In December 2009 in Washington, D.C., the USCCB wrote and published the Fifth Edition of the Ethical and Religious Directives for Catholic Health Care Services ("ERDs" or "Directives"). (Compl. ¶ 60; Aff. of Linda Hunt, ¶ 42.) The USCCB has no authority to enforce the ERDs. (Aff. of Linda Hunt, ¶ 43.) Individual bishops exercise authority under Canon Law to bind all Catholic health care institutions located within their diocese to the ERDs as particular law within the diocese. (*See, e.g.,* General Decree of the Most Reverend Earl Boyea, Bishop of Lansing, ECF No. 46-23, Ex. 22.)

4

### Ethical and Religious Directives for Catholic Health Care Services ("ERDs")

The purpose of the ERDs are to "reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today." (Preamble, ERDs, ECF No. 46-2, Ex. 1.) The Directives "express the Church's moral teachings," but "do not cover in detail all of the complex issues that confront Catholic health care today." (*Id.*)

Directive 5 states that "Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel." (Directive 5, ERDs.) Directive 45 defines "abortion" and prohibits Catholic health care institutions from providing abortion services. (Directive 45, ERDs.) Directives 5 and 45 form the basis of Plaintiff's action.

In lay terms, Ms. Means' premise is that she should have received, or at least been advised of the option to receive, an abortion to ameliorate the painful effects of chorioamnionitis and funistis. However, Ms. Means could not receive an abortion because Directive 45 directly forbids abortion services, and Directive 5 bound MHP to adhere to that direction.

She brings one count of negligence against Defendant USCCB. Plaintiff asserts that the USCCB assumed a duty to promulgate policies in a manner that ensures patients receive medically appropriate care, and the USCCB breached that duty by disseminating the ERDs which impeded Trinity Health and/or MHP's discretion to provide Plaintiff with appropriate medical care. (Compl. ¶¶ 96-103.) The USCCB asserts that this Court lacks personal jurisdiction to hear a claim against it.

Plaintiff brings one count of negligence against Urban, Ladenburger, and Mollis on. Plaintiff alleges that they are personally and vicariously liable as chairs of CHM because they adopted and approved the ERDs as policy at Trinity Health and its affiliated hospitals, including MHP. Plaintiff claims that the CHM Defendants breached their duty to establish policies that ensure patients receive reasonable care that does not increase harm to patients. (*Id.* at ¶¶ 106-117.) The CHM Defendants assert that Plaintiff has failed to state a cognizable legal claim.

Plaintiff initially filed her suit in the United States District Court for the Eastern District of Michigan. The CHM Defendants moved to change venue to the Western District of Michigan because Plaintiff's claims are based upon events that happened in Muskegon, Michigan. (ECF No. 13.) The Court in the Eastern District transferred venue to this Court, pursuant to 28 U.S.C. § 1404(a).

## II. Motion to Dismiss for Lack of Personal Jurisdiction

Where, as here, the Court decides a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff bears the burden of making a prima facie showing that the court has personal jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). To meet this burden, the plaintiff must establish "with reasonable particularity" sufficient contacts between the defendant and the forum state to support jurisdiction. *Id.*; *see also See, Inc. v. Imago Eyewear Pty., Ltd.*, 167 F. App'x 518, 520-21 (6th Cir. 2006) ("[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."). In evaluating the plaintiff's response to the motion to dismiss, the Court

construes the facts in the light most favorable to the plaintiff and disregards contradictory evidence proffered by the defendant. *Neogen*, 282 F.3d at 887.

A defendant may be subject to general personal jurisdiction and/or specific personal jurisdiction (also known as "limited" personal jurisidiction). "Limited jurisdiction extends only to claims arising from the defendant's activities that were either within Michigan or had an in-state effect," whereas "[g]eneral jurisdiction . . . enables a court in Michigan to exercise jurisdiction over a [defendant] regardless of whether the claim at issue is related to its activities in the state or has an in-state effect." *Id.* at 888 (citing *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1089 (6th Cir.1989)). In Michigan, the exercise of specific personal jurisdiction requires a two-step process: "(1) first, the court must determine whether any of Michigan's relevant long-arm statutes authorize the exercise of jurisdiction over Defendants; and, if so, (2) the court must determine whether exercise of that jurisdiction comports with constitutional due process." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007). The reach of Michigan's long-arm statute has been construed as co-extensive with the limits of constitutional due process. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 954 F.2d 1174, 1176 (6th Cir.1992); *Green v. Wilson,* 565 N.W.2d 813, 816-17 (Mich. 1997).

Due process concerns are governed by the standard articulated in *International Shoe* and expounded by its progeny: the Court must ensure a defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

In addition to the "minimum contacts" analysis required by *International Shoe*, the question of due process in the context of establishing specific personal jurisdiction turns on whether "the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). The Sixth Circuit has formulated a three-prong test to evaluate whether exercising specific personal jurisdiction satisfies due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

In this case, neither party has analyzed the application of Michigan's long-arm statute. Rather, the parties focus on whether jurisdiction over the USCCB comports with due process under the three-prong test. Additionally, Plaintiff contends that Defendant USCCB waived its personal jurisdiction defense when it failed to include the defense in its filing concurring with the CHM Defendants' motion to change venue.

**A. Waiver**

Under Federal Rule of Procedure 12(h), a party waives a defense for lack of personal jurisdiction when it fails to raise the issue in a responsive pleading or a general appearance. *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.2d 1110, 1120 (6th Cir. 1994). "Only those submissions, appearances and filings that give 'plaintiff a reasonable expectation that [defendants] will defend the suit on the merits or must cause the court to go to some effort that would be wasted

8

if personal jurisdiction is later found lacking,' result in waiver of a personal jurisdiction defense." *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) (quoting *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)).

In this case, Defendant USCCB entered a special appearance "for the limited purpose of challenging personal jurisdiction and concurring in co-Defendants' venue challenge." (Def.'s Not. of Special Appearance 2, ECF No. 14.) The caselaw in this Circuit does not directly address this atypical procedural history nor provide a bright line rule whether joining a co-defendant's motion to change venue qualifies as a submission to personal jurisdiction. *See Gerber,* 649 F.3d at 519 (citing *Days Inns Worldwide, Inc. v. Patel,* 445 F.3d 899, 905 (6th Cir. 2006), and *Mobile Anesthesiologists,* 623 F.3d at 443) (noting the "dearth of caselaw" defining what types of filings qualify as a submission to the court's personal jurisdiction)). This Court finds that Defendant USCCB did not accede to the district court's personal jurisdiction when it made a special appearance solely to contest the lack of personal jurisdiction and lack of venue. Although the filing of a special appearance is not required under Rule 12(h), *see Gerber*, 649 F.3d at 522 (Moore, J. concurring), the special appearance manifests the USCCB's intent not to submit to the personal jurisdiction of the district court. Its special appearance did not create any expectation that the USCCB would defend the suit on the merits. *See Gerber*, 649 F.3d at 519 (citing *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (party filed special appearance to contest lack of personal jurisdiction)). Thus, the Court finds that the USCCB did not waive its personal jurisdiction defense.

### B. Application of the *Southern Machine* Three-Prong Test

The Sixth Circuit "views the purposeful availment prong of the *Southern Machine* test as 'essential' to a finding of personal jurisdiction." *Intera Corp. v. Henderson,* 428 F.3d 605, 616 (6th

Cir. 2005) (citing *Calphalon Corp.* 228 F.3d at 722). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984)), "or of the 'unilateral activity of another party or a third person,'" *Burger King*, 471 U.S. at 475 (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall,*, 466 U.S. 408, 417 (1984)). *See also Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003).

"Physical presence is not the touchstone of personal jurisdiction." *See Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001). "Purposeful availment" occurs when "the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a "substantial connection" with the forum State.' " *Neogen.,* 282 F.3d at 889 (quoting *Burger King Corp.,* 471 U.S. at 475).

Plaintiff argues that the USCCB purposefully availed itself of the burdens and protections of Michigan law by intending Catholic entities in Michigan adhere to its ERDs. (Pl. Br. at 15, 19, ECF No. 46.) Plaintiff attempts to draw numerous connections between the USCCB, CHM, Trinity Health, and the State of Michigan to show that the USCCB has purposefully availed itself of the privilege of acting in Michigan. The connections are tenuous at best. Plaintiff cites *Bennett v. J.C. Penney*, 603 F. Supp. 1186 (W.D. Mich. 1985), *Lanier v. American Board of Endodontics*, 843 F.2d 901 (6th Cir. 1988), and *Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012), as analogous to this case.

In *Bennett*, this Court found personal jurisdiction over a non-profit national trade association because the association distributed literature in Michigan, solicited members and collected dues from

10

them in Michigan, and required that products built by its members meet its safety standards. *Bennett*, 603 F. Supp. at 1188-89. This Court concluded that the association "purposefully availed itself of business opportunities within Michigan." *Id.* at 1189.

In *Lanier*, the Sixth Circuit addressed whether the Michigan long-arm statute covered a dental certification board that sent and received application materials by mail from a Michigan dentist. *Lanier*, 843 F.2d at 910. The Court of Appeals found that the board's activities constituted "transaction of any business" under the long-arm statute, Michigan Compiled Laws § 600.715(1), because the board generated business in a Michigan commercial market. *Id.* at 910.

Finally, in *Schneider*, the Sixth Circuit determined that a lawyer-defendant in a fraud action had purposefully availed himself of the benefits and burdens of Ohio, where the lawyer drafted misleading letters to his client's investors regarding the status of their funds, knowing the letters would be sent to investors in Ohio. *Schneider*, 669 F.3d at 702-03.

None of these cases support jurisdiction over the USCCB. Plaintiff has shown that the USCCB directs vast amounts of literature towards Michigan (*see, e.g.,* USCCB Charter for the Protection of Children & Young People, ECF No. 46-6, Ex. 5; Diocese of Grand Rapids Office of Child & Youth Protection website, ECF No. 46-7, Ex. 6; USCCB "Who We Are" website, ECF No. 46-8, Ex. 7; Diocese of Gaylord Press Release, ECF No. 46-9, Ex. 8 (describing how the USCCB has sent bulletin inserts and pulpit announcements regarding abortion funding in health care reform)), provides grant funding for dioceses and organizations across the U.S. (*see, e.g.,* USCCB Subcommittee on Catholic Home Mission Grants, ECF No. 46-10, Ex. 9-1; Catholic Campaign for Human Development on USCCB "About Us" website, ECF No. 46-10, Ex. 9-3), and requests dioceses in the United States to establish ministries such as natural family planning programs (*see,*

*e.g.,* Diocese of Lansing NFP website, ECF No. 46-9, Ex. 8-5). But the activities alleged are not analogous to those in *Bennet, Lanier*, or *Schneider*. In each case Plaintiff has cited, the Court's exercise of personal jurisdiction was premised upon a specific business transaction between the parties to the lawsuit. The transaction created a legal relationship, with the burdens and protections of the forum's law, such that the parties could expect to be haled into the forum. Plaintiff does not explain how the premise for jurisdiction in those cases applies here. The USCCB has not entered a business transaction with Plaintiff that created a legal relationship. Merely distributing literature and calling its members to action are not business transactions. Even if grant funding might constitute business transactions, Plaintiff has not shown with sufficient particularity that those transactions took place in Michigan, nor that this cause of action arises from those transactions.

Plaintiff's reliance on *Asahi Metal Industries Co. v. Supreme Court of California*, 480 U.S. 102 (1987), is likewise incoherent because Plaintiff has not demonstrated how the USCCB placed a product in the stream of commerce. *See also Keeton v. Hustler,* 465 U.S. 770, 772 (1983) (defendant magazine could reasonably anticipate being haled into court in forum where it "continuously and deliberately exploited the [forum] market"); *Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, (6th Cir. 2003) (adopting Justice O'Connor's stream of commerce "plus" approach articulated in *Asahi* to find a nationwide distribution agreement indicated purposeful availment).

Plaintiff also suggests that the USCCB is connected to Michigan because it has subsidiaries like Trinity Health and MHP in Michigan, which share in its tax-exempt status. (Pl.'s Br. at 6, 16.) However, Plaintiff has not demonstrated a subsidiary relationship, nor any other legally cognizable relationship, between the USCCB and a Michigan entity. The fact that the USCCB communicates

with the IRS regarding the tax-exempt status of Catholic entities does not indicate a subsidiary relationship. Rather, the IRS Group Ruling on tax-exempt status of Catholic entities relies on the Official Catholic Directory to determine whether an entity is associated with the Roman Catholic Church. (*See* The Official Catholic Directory, ECF No. 46-12, Ex. 11.) Entities derive their tax-exempt status from their association with the Roman Catholic Church, not their association with the USCCB. (2009 Group Ruling at 1, ECF No. 46-11, Ex. 10; Letter from IRS to USCCB at 9-10, July 28, 2009, ECF No. 46-11, Ex. 10.) The IRS Group Ruling Letter is addressed to the USCCB, but the Ruling in no way indicates that Trinity Health, MHP, or CHM are subsidiaries of the USCCB. (2009 Group Ruling.) The only tax-related connection between the USCCB and Trinity Health is that both are publicly recognized as Catholic organizations by the Roman Catholic Church. That connection is not focused in Michigan.

Plaintiff does not advance a sufficient theory that the USCCB purposefully availed itself of Michigan law, even less that drafting the ERDs constituted purposeful availment. The USCCB did not draft the ERDs in Michigan, nor did the USCCB decide to adopt the ERDs in Michigan. Rather, Plaintiff's own evidence demonstrates that local Bishops overseeing their dioceses and health care entities located in their dioceses adopt the ERDs as particular law.  (*See., e.g.,* General Decree of the Most Reverend Earl Boyea, Bishop of Lansing, ECF No. 46-23, Ex. 22.) Thus, it is not clear to the Court how the USCCB's drafting the policy in Washington, D.C., has a "substantial connection" to Michigan such that the USCCB could reasonably expect to be haled into Michigan court on account of it.

### 2. "Arises From"

The second *Southern Machine* factor is whether the cause of action arises from the defendant's activities in the forum state. *S. Mach. Co.*, 401 F.2d at 381. "Even if a defendant purposefully avails himself to the benefits of doing business in a forum, the exercise of specific jurisdiction only complies with due process if 'the cause of action . . . ha[s] a substantial connection with the defendant's in-state activities.'" *Cmty. Trust Bancorp, Inc. v. Cmty. Trust Fin. Corp.*, 692 F.3d 469, 472 (6th Cir. 2012) (quoting *Bird v. Parsons,* 289 F.3d 865, 875 (6th Cir. 2002)(internal quotation marks omitted)). "The defendant's contacts with the forum state must relate to the operative facts and nature of the controversy." *Id.* (citations omitted).

Plaintiff argues that her cause of action arises from the adoption of the ERDs as policy at Mercy Health Partners. (Compl. ¶¶ 98-104; 113-117, 115 [sic], 118 [sic].) Plaintiff builds a lengthy causal chain: But for the USCCB's drafting of Directive 45 prohibiting abortion, and but for Directive 5 mandating implementation of the Directives, and but for the implementation of the Directives at MHP at the intent of the USCCB, Plaintiff would not have suffered severe pain and anguish. Her claims were "made possible" by the USCCB's decision to require Catholic hospitals to follow its Directives. (Pl.'s Br. at 21.)

This argument is inadequate to show her cause of action arose from the USCCB's action *in Michigan*. First, Plaintiff's but-for theory of relatedness is overinclusive. "The problem is that it 'has . . . no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain.'" *Beydoun v. Wataniva Rest. Holding, O.S.C.*, 768 F.3d 499, 507 (6th Cir. 2014) (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 322 (3d Cir. 2007)).

14

Second, Plaintiff has not shown how her cause of action was proximately caused by the USCCB's in-state activities. "[O]nly consequences that *proximately* result from a party's contacts with a forum state will give rise to jurisdiction." *Beydoun*, 768 F.3d at 507 (emphasis in original) (citing *Burger King Corp.*, 471 U.S. at 474). Plaintiff misunderstands the fundamental distinction between the Roman Catholic Church, the USCCB, and the role of bishops. *See* Pl.'s Br. at 22, fn.10. The intent of the USCCB in Washington, D.C., is legally irrelevant to the analysis of proximate cause because only the local Michigan bishop could require MHP to adhere to Directive 45. The USCCB has no authority to require MHP or any Trinity Health affiliate to implement the Directives. Merely intending and foreseeing that MHP would adhere to the Directives does not constitute proximate cause. (Pl. Br. at 22; Compl. ¶ 97, 71.) That the USCCB could foresee that a Catholic health care entity would implement the Directives is not sufficient for a showing of proximate cause. "[F]oreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagon*, 444 U.S. at 295..

### 3. Reasonable Exercise

The final *Southern Machine* factor is whether, based on the quality and quantity of contacts, exercise of personal jurisdiction over the defendant is reasonable. *S. Mach. Co.*, 401 F.2d at 381. "An inference arises that the third factor is satisfied if the first two requirements are met." *Bird*, 289 F.3d at 875 (citing *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir. 1996)). When assessing the reasonableness of exercising personal jurisdiction, the Court considers (1) the burden on defendant, (2) the interest of the forum state, (3) the plaintiff's interest in obtaining relief, and (4) other state's interests in securing the most efficient resolution. *Air Prods.*, 503 F.3d at 554-55 (citing *Intera Corp*, 428 F.3d at 618).

Here, Plaintiff is not entitled to an inference of reasonableness because she has not demonstrated that the first two factors are satisfied. The Court finds that exercise of personal jurisdiction over the USCCB is unreasonable where Plaintiff has not demonstrated that the USCCB has purposefully availed itself of the privilege in acting in Michigan, nor that the cause of action arises from the USCCB's actions in Michigan.

Because this Court finds that it lacks personal jurisdiction over Defendant USCCB, the transfer of this case to this Court was improvidently granted under 28 U.S.C. § 1404(a). *See Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960) (requiring the transferor court to find that the transferee court may exercise personal jurisdiction over defendants prior to transfer, regardless of a defendant's consent to personal jurisdiction in the transferee court). The Eastern District of Michigan does not have personal jurisdiction over Defendant USCCB under the Michigan law either, for the reasons stated above. Accordingly, this Court will dismiss the case against Defendant USSCB.

### III. Motion to Dismiss for Failure to State a Claim

In reviewing a Rule 12(b)(6) motion to dismiss, the Court must "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff,'" but "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing how the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this statement is to "give the

defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 677). Where a complaint pleads facts that are merely consistent with a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Further, under Rule 10(c), the Court can consider the exhibits attached to the complaint without converting a defendant's Rule 12(b)(6) motion into a motion for summary judgment. Fed. R. Civ. P. 10(c); *see Koubriti v. Convertino*, 593 F.3d 459, 462 n.1 (6th Cir. 2010) ("Documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss."). "In addition, when a document is referred to in the pleadings and is integral to the claims,

it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Il. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007).

Defendants move to dismiss the complaint because (1) the individual defendants are not liable for common law negligence for adopting policies for the hospital; (2) Michigan law shields the individual defendants from liability; (3) the ecclesiastical abstention doctrine protects the directors in adopting policies that express religious beliefs; and (4) Plaintiff does not have standing to seek relief for third parties. After giving considerable thought to this matter, the Court finds that Plaintiff's allegations do not support a cause of action that this Court can adjudicate.

### A. Common Law Negligence Claim

This Court, sitting in diversity, applies the substantive law of Michigan. *Klaxton v. Senator Elec. Mfg. Co.,* 313 U.S. 487 (1942); *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).To assert a common law claim of negligence, Plaintiff must prove that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 195 (Mich. 2012) (citations omitted).

The parties primarily contest the element of duty. Recognition of a duty arises from statute, a contractual relationship, or by operation of the common law. *Id.* at 196. "The determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligation on the actor's part *to act* for the benefit of the subsequently injured person." *Id.* (emphasis in original) (citations omitted).

Michigan law recognizes that a "hospital may be 1) directly liable for malpractice, through claims of negligence in supervision of staff physicians as well as selection and retention of medical

18

staff, or 2) vicariously liable for the negligence of its agents." *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 651 N.W.2d 356, 361 (Mich. 2002) (citations omitted). However, Plaintiff does not maintain that the CHM Defendants are directly liable for negligence in supervision, selection, or retention. Rather, Plaintiff argues that entities that establish policies governing the delivery of health care owe a duty to patients and may be liable for "independent negligence," as distinct from malpractice or vicarious liability. (Pl.'s Br. at 6, ECF No. 48.)

Plaintiff offers little case law in direct support of this contention. She points to a footnote in a Michigan case, and supports her point with case law from Texas, Delaware, Tennessee, and New Jersey jurisdictions, to suggest that Michigan recognizes claims directed to hospital policies and procedures. *See Theophelis v. Lansing Gen. Hosp.*, 424 N.W.2d 478, 480 n.3 (Mich. 1988). Plaintiff cites to *Ware v. Bronson Methodist Hospital*, 2014 WL 5689877 (Mich. Ct. App. Nov. 4, 2014), as the single Michigan case concerning hospital policy and procedures as a basis for a negligence claim. However, the Michigan Court of Appeals did not determine the parameters of the legal duty owed to a patient by a hospital network when it adopts policies. The *Ware* court found that the claim of inadequate confidentiality polices was a medical malpractice claim, and it was untimely. *Id*. at *5.

Plaintiff further attempts to buttress her claim by citing unpublished cases outside the healthcare context, *e.g., Roberts v. Bennett Enterprises, Inc.,* No. 04-73540, (E.D. Mich), in which a hotel guest brought a lawsuit against the hotel franchisor corporation regarding the hot water temperature based on fact-intensive inquiry under a principal-agent theory. *Id*. at 2006 WL 3825067, * 4 (E.D. Mich. Dec. 26, 2006). But Plaintiff has not advanced a principal-agent theory other than to contend that CHM adopted policies for its affiliated hospitals.

Thus, Plaintiff has not sufficiently demonstrated that Michigan law recognizes a duty to a patient by a sponsor of a hospital network. Such an action may be cognizable, but Plaintiff has not demonstrated that her claim is supported by precedent, nor sufficiently analogous case law, that would allow this Court to determine CHM's duty, where it is a non-incorporated religious organization that sponsors a hospital network for the purpose of instilling its religious identity.

Even if Plaintiff could articulate a cognizable legal duty, the Court could not adjudicate the elements of breach and proximate cause because it necessarily implicates the ecclesiastical abstention doctrine, discussed below, which prevents the Court from interpreting religious doctrinal texts. Plaintiff has not presented a way for this Court or a jury to analyze CHM's duty, breach, or causation without reference to the text of the ERDs, which are an expression of Catholic doctrine.

**B. Michigan Refusal Statutes**

Defendants claim that they are immune from suit under Michigan Compiled Laws §§ 333.20181 and 333.20183(2), commonly known as the Refusal Statutes. The statutes provide legal protection to doctors and hospitals that refuse to perform abortions.

Plaintiff responds that those statutes are circumscribed by laws that require hospitals to provide proper treatment to women seeking emergency treatment for miscarriages. (Pl.'s Br. at 16.) In support of her position, Plaintiff cites to a Supreme Court case addressing whether a state parental notification law was constitutional where it contained no exception to allow a minor to obtain an abortion necessary to preserve her life. *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006). Plaintiff fails to show how that case should affect this Court's analysis of the facts and legal claims in this case. Plaintiff also cites to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, for the proposition that a hospital may not refuse to take

20

action if a patient would be endangered, even when the action involves abortion. (Pl.'s Br. at 17.) Plaintiff has not pled a violation of EMTALA, nor shown that MHP or any CHM-affiliated hospital is covered by EMTALA.

Defendants have not demonstrated that the refusal statutes, which cover a "hospital, clinic, institution, teaching institution, or other health facility," covers them as individuals who comprise a board that establishes hospital policy. *See* Mich. Comp. Laws § 333.20181.

Considering the lack of discovery and briefing on this issue, the Court declines to rule at this time on the applicability of the Michigan refusal statutes.

### C. Applicability of Ecclesiastical Abstention

Defendants argue that the Free Exercise Clause of the First Amendment bars Plaintiff's action under the church autonomy doctrine, also referred to as the ecclesiastical abstention doctrine. That doctrine is rooted in *Watson v. Jones*, 80 U.S. 679 (1871), in which the Supreme Court first established principles limiting the role of civil courts in adjudicating religious controversies. *Watson* and its progeny limit the power of courts to hear suits "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by . . . church judicatories . . ." *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008) (quoting *Watson*, 80 U.S. at 727; citing *Serbian E. Orthodox Diocese v.Milivojevich,* 426 U.S. 696 (1976)).   Ecclesiastical abstention affirms "freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

21

Where the Court must scrutinize religious doctrine to assess the merits of a legal position, the Court risks excessively entangling the law in the free exercise of religion. *See Ogle*, 279 F. App'x at 395 (recognizing the applicability of the First Amendment to the judiciary as well as the legislature). The Court can hear a tort suit if it turns on the availability of secular standards without reference to religious doctrine. *Ogle*, F. App'x at 385 (citing *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2005); *Sanders v. Casa View Baptist Church*, 134 F.3d 331. 336-38 (5th Cir. 1998)).

Defendants claim, and Plaintiff does not refute, that the ERDs are "a statement of the Roman Catholic Church's moral and religious postures as it relates to health care issues." (Def.'s Br. at 17, ECF No. 42.) The stated purpose of the Directives are "to provide authoritative guidance on certain moral issues that face Catholic health care today." (Preamble, ERDs, ECF No. 46-2, Ex. 1.) Defendants argue that a trier of fact must interpret the Directives in order to assess whether they ensure patients receive reasonable care. (Def.'s Br. at 18.) Interpretation of the ERDs is an interpretation of Catholic theology, which the ecclesiastical abstention doctrine prohibits.

Plaintiff responds that the ecclesiastical abstention doctrine is not implicated because she is not asking the Court to determine the validity of the Directives, but to determine whether the imposition of the Directives on MHP caused her harm. (Pl.'s Br. at 22.) Plaintiff claims that the analysis would be the same whether CHM imposed the ERDs from religious or secular motivations. (*Id.*) Plaintiff argues that the "Directives clearly prohibit hospitals from providing direct abortion under any circumstance, including in emergencies to manage miscarriages, and from providing information about abortions." (Pl.'s Br. at 23.)

Plaintiff's claim oversimplifies the text and theological underpinnings of the ERDs, as well as how the Directives are applied in hospital settings. Plaintiff's complaint about the unavailability of "direct abortions" under the ERDs would require a nuanced discussion about how a "direct abortion" is defined in Catholic doctrine.

Directive 45 clearly prohibits direct abortions, defined as "the directly intended termination of a pregnancy before viability." Do procedures that directly intend to treat a serious pathologic condition of the mother (such as acute chorioamnionitis and funisitis), and indirectly result in termination of the pregnancy, constitute a direct abortion? (*See* Directive 47.) When do medical procedures that augment—rather than induce—labor constitute a direct abortion? (*See* Directive 49.) Must the procedure satisfy the Catholic principle of double-effect to be permissible under the ERDs? (*See* Directive 45's discussion of "sole immediate effect" and "material cooperation.") Can the treating doctor exercise independent judgment or is she required to consult a Catholic ethicist before providing emergency care? (*See* Directive 37.) Does the ethicist have an obligation to consult the local bishop in his moral and theological analysis of the medical treatment options? (*See* General Introduction; Directive 37.)

These questions demonstrate how the application of the Directives are inextricably intertwined with the Catholic Church's religious tenets. This Court is competent to address whether the medical care provided by Mercy physicians, and vicariously provided by Trinity Health, constitute negligence or medical malpractice. However, the Court cannot determine whether the establishment of the ERDs constitute negligence because it necessarily involves inquiry into the ERDs themselves, and thus into Church doctrine.

While the application of the ecclesiastical abstention doctrine forecloses inquiry into the policies themselves, Plaintiff is not left without recourse to vindicate her rights to appropriate and necessary medical care. The Court must defer to religious institutions in their articulation of church doctrine and policy. However, the Court's consideration of the legal duty of a physician to provide adequate medical care is not a matter of church doctrine. Plaintiff has a right to remedy in a secular court for medical malpractice without needing to resolve doctrinal matters. *See, e.g., Lundman v. McKown*, 530 N.W.2d 807, 821-22 (Minn. Ct. App. 1995) (finding that nurse who provided Christian Science nursing services, which disavowed medical treatment, owed a duty to patient with diabetes, but a committee to protect Christian Science doctrines, a Christian Science nursing facility that provided advice, and the First Church of Christ Science owed no duty to patient nor duty to oversee caregivers). It is not up to the Court to mandate the larger structural and policy reform to Catholic hospitals that Plaintiff seeks; that issue is left to the Church and its tribunals.

### D. Standing

Finally, Defendants argue that Plaintiff lacks standing to request an injunction that prohibits Catholic health care institutions from adopting the ERDs. (Def.'s Br. at 20.) However, Plaintiff's demand for relief does not request such broad injunctive relief. (Compl. at 20-21.) Defendants overstate Plaintiff's position.

## IV. Conclusion

For the reasons stated above, the Court lacks jurisdiction over Defendant USCCB. Moreover, the Court shall not adjudicate the negligence claim against any Defendants because it would impermissibly intrude upon ecclesiastical matters. Thus, the case shall be dismissed.

An order in accordance with this opinion shall follow.


Dated: <u>June 30, 2015</u>                                      /s/ Robert Holmes Bell
                                                                ROBERT HOLMES BELL
                                                                UNITED STATES DISTRICT JUDGE