**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: September 08, 2016

Ms. Brigitte Amiri
Ms. Jennifer Dalven
Ms. Alexa Kolbi-Molinas
Ms. Louise Melling
Ms. Alyson Marie Zureick
ACLU, 125 Broad Street, 18th Floor
New York, NY 10004

Mr. Cameron R. Getto
Zausmer, August & Caldwell
31700 Middlebelt Road, Suite 150
Farmington Hills, MI 48334

Mr. Daniel S. Korobkin
Ms. Kary Leslie Moss
Mr. Michael Jay Steinberg
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Dennis J. Levasseur
Mr. Michael Joseph Serra
Bodman, 1901 Saint Antoine Street, Sixth Floor
Detroit, MI 48226

Mr. Jeffrey E. Ostrow
Simpson Thacher & Bartlett
2475 Hanover Street
Palo Alto, CA 94304

Mr. Thomas P. Van Dusen
Bodman, 201 W. Big Beaver Road, Suite 500
Troy, MI 48084

Mr. James J. Walsh
Bodman
201 S. Division Street, Suite 400
Ann Arbor, MI 48104

        Re: Case No. 15-1779, *Means v. U.S. Conf. of Catholic Bishops, et al*
            Originating Case No. : 1:15-cv-00353

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                              Yours very truly,

                              Deborah S. Hunt, Clerk


                              Cathryn Lovely
                              Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0224p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| TAMESHA MEANS,<br><br>      *Plaintiff-Appellant,*<br><br>v.<br><br>UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; STANLEY URBAN; ROBERT LADENBURGER; MARY MOLLISON,<br><br>      *Defendants-Appellees.* | No. 15-1779 |

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-00353—Robert Holmes Bell, District Judge.

Argued: June 17, 2016

Decided and Filed: September 8, 2016

Before: SILER, BATCHELDER, and GIBBONS, Circuit Judges

_____

**COUNSEL**

**ARGUED:** Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellant. Cameron R. Getto, ZAUSMER, AUGUST & CALDWELL, P.C., Farmington Hills, Michigan, for Appellee Conference of Catholic Bishops. Thomas P. Van Dusen, BODMAN PLC, Detroit, Michigan, for Appellees Urban, Ladenburger, and Mollison. **ON BRIEF:** Brigitte Amiri, Alexa Kolbi-Molinas, Louise Melling, Jennifer Dalven, Alyson Zureick, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Brooke A. Merriweather-Tucker, Daniel S. Korobkin, Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Appellant. Cameron R. Getto, ZAUSMER, AUGUST & CALDWELL, P.C., Farmington Hills, Michigan, for Appellee Conference of Catholic Bishops. Thomas P. Van Dusen, Dennis J. Levasseur, Michael J. Serra, BODMAN PLC, Detroit, Michigan, for Appellees Urban,

1

Ladenburger, and Mollison.  Jeffrey E. Ostrow, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California, for Amicus Curiae.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  Plaintiff Tamesha Means miscarried at eighteen weeks' gestation.  She sought treatment at a Catholic hospital in western Michigan, which allegedly failed to provide her accurate information or diagnose and treat a serious bacterial infection.  Three years later, Means sued, not the hospital or any of its physicians, but the United States Conference of Catholic Bishops (USCCB) and three individuals who have served as chair of the unincorporated organization Catholic Health Ministries (CHM).  Means has alleged that USCCB and the CHM defendants are liable in ordinary negligence for promulgating and enforcing a publication of mandatory ethical guidelines dictated by Catholic doctrine (the "Directives"), which she claims dictated the poor treatment she received.  The district court dismissed Means's complaint for lack of personal jurisdiction over USCCB and failure to state a claim against the CHM defendants.  We AFFIRM.

## I.  FACTS AND PROCEDURAL HISTORY

Means was eighteen weeks pregnant when she went into labor on December 1, 2010.[1]  She went to Mercy Health Partners, the only hospital within thirty minutes of her residence.  Doctors at Mercy Health diagnosed Means with preterm premature rupture of membrane.  This condition usually results in a stillbirth or the baby's death soon after birth.  At this time, however, the unborn baby still had a heartbeat.

Despite the gravity of Means's condition, which created serious risks to herself and her baby, Mercy Health sent her home with some pain medication and told her to return the following week for her regularly scheduled appointment.  Although Means was told that her baby was not yet viable, no one told her that the baby would likely not survive or that continuing

---

[1] Because Means's case was decided below on a motion to dismiss, all facts alleged in the complaint are taken as true for the purpose of this opinion.

her pregnancy could endanger her own health. Mercy Health did not give Means the option of artificially completing the miscarriage or terminating the pregnancy.

The next morning, Means returned to the hospital with a fever, excruciating pain, and bleeding. Mercy Health did not give her additional treatment or treatment options, even though Means's treating physician suspected she had a serious bacterial infection that can cause infertility and even death. Instead, once Means's fever went down, the hospital sent her home. Means was told to return if her fever came back or if her contractions worsened.

Means returned to Mercy Health that night with regular, extremely painful contractions. While the hospital was preparing to discharge her for the third time, shortly after midnight, Means delivered her baby breech. The baby died within three hours. The placental pathology report confirmed that Means did in fact have two acute bacterial infections at the time she gave birth.

Two years later, a public health educator working on a federally funded public health surveillance project on infant and fetal mortality discovered and inquired into Means's case. Mercy Health's Vice President of Mission Services Joseph O'Meara explained the hospital's inaction by stating that the Directives prohibited the hospital from inducing labor or taking similar action in Means's situation. Since the statute of limitations had run out on any medical malpractice claim Means may have had,[2] she sued the Catholic entities responsible for the Directives on a theory of ordinary negligence, alleging that the Directives caused Mercy Health's harmful inaction.

USCCB is a national public policy agency established by the Roman Catholic Bishops of the United States. It is a not-for-profit entity incorporated in the District of Columbia. USCCB published the Fifth Edition of *Ethical and Religious Directives for Catholic Health Care Services* in December 2009.

The other three defendants—Stanley Urban, Robert Ladenburger, and Mary Mollison ("the CHM defendants")—are current and former chairs of an unincorporated entity known as

---

[2]Michigan has a two-year statute of limitations for medical malpractice actions. Mich. Comp. Laws § 600.5805(6).

Catholic Health Ministries.[3]  CHM is the Catholic sponsor of Trinity Health, the healthcare system that operates Mercy Health and other hospitals.  CHM's "Canonical Bylaws state that CHM 'will adhere to [the Directives] promulgated by [USCCB].'"  In turn, Trinity Health's Amended Articles of Incorporation provide that its "activities . . . shall be carried out in a manner consistent with," among other sources, "directives promulgated from time to time by [CHM] and the values and principles inherent in the medical-moral teachings of the Church (such as the [Directives]) as promulgated from time to time by [USCCB]."  The most recent versions of CHM's Canonical Bylaws and Trinity Health's Articles of Incorporation were adopted in 2009, when Mollison was chair of CHM.  Ladenburger was chair in 2010, when Means's alleged injury occurred.  Urban is CHM's current chair.  Urban, Ladenburger, and Mollison are residents of Pennsylvania, Colorado, and Wisconsin, respectively.  Means has alleged that CHM's decision to adopt the Directives took place within the Eastern District of Michigan.

## II.  PERSONAL JURISDICTION AND VENUE

Means brought her complaint against these four out-of-state defendants in the Eastern District of Michigan under the federal court's diversity jurisdiction.  *See* 28 U.S.C. § 1332(a).  The CHM defendants filed—and the court granted—a motion to transfer the case to the Western District of Michigan, the locus of Means's residence and Mercy Health.  USCCB filed a special appearance for the dual purpose of concurring in that motion and of filing its own motion to dismiss for lack of personal jurisdiction.  Although the Eastern District disregarded USCCB's personal jurisdiction arguments, the Western District granted USCCB's motion to dismiss for lack of personal jurisdiction.

Means has appealed the district courts' venue and personal jurisdiction decisions.  We review de novo the district court's decision to dismiss for lack of personal jurisdiction.  *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008).  We review for abuse of discretion the district court's decision to transfer

---

[3]According to the complaint, CHM is a "public juridic person," a recognized entity under canon law that can stand trial through its legitimate representative.  Means has alleged that CHM's chair is its "legitimate representative" for each relevant year.

venue. *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 262 (6th Cir. 1998). Neither decision presents grounds for reversal here.

We turn first to Means's argument that USCCB waived its personal jurisdiction defense. USCCB entered a special appearance "for the limited purpose of challenging personal jurisdiction and concurring in [the CHM defendants'] venue challenge." As part of its response to the CHM defendants' motion to change venue, USCCB stated that the court should dismiss USCCB from the case for lack of personal jurisdiction. USCCB did not file its motion to dismiss for lack of personal jurisdiction for another three weeks. Because USCCB's response requested additional relief, but did not include its personal jurisdiction arguments, Means argues that the defense is waived pursuant to Federal Rule of Civil Procedure 12(g) and (h).

In the typical waiver scenario, a defendant waives its personal jurisdiction defense if "submissions, appearances and filings . . . give '[the p]laintiff a reasonable expectation that [the defendant] will defend the suit on the merits or . . . cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking.'" *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) (quoting *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)). This type of waiver is not present: USCCB deliberately preserved its defense by filing a special appearance. *See id.* at 520 (citing *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000)) ("[A] personal jurisdiction defense is not waived when a party makes a special appearance solely to contest personal jurisdiction's existence.").

Means argues instead that USCCB inadvertently waived its defense by turning its response filing into a Rule 12(b) motion. Rule 12(h) provides that "[a] party waives any defense listed in Rule 12(b)(2)–(5) by" omitting it from a Rule 12 motion. *See also* Rule 12(g)(2) (requiring a party making a Rule 12 motion to raise all defenses or objections available to the party at the time of the motion). Rule 12(b) includes motions to dismiss for lack of personal jurisdiction *and* for improper venue. If USCCB filed a motion to dismiss for improper venue and omitted its personal jurisdiction defense, that defense would be waived by operation of Rule 12(h).

We do not think that USCCB's response filing should be construed as a Rule 12 motion to dismiss for improper venue. The CHM defendants' motion to transfer venue was not a Rule 12 motion, and in its response USCCB simply indicated the proper disposition of the motion as to itself. Since a court may transfer venue only to another district where the case could have been brought, *see* 28 U.S.C. §§ 1404, 1406, the Eastern District should have determined whether the Western District could exercise personal jurisdiction over USCCB. It would be ironic indeed if USCCB could waive its personal jurisdiction defense by raising it in this manner. Since Means points to nothing in the Rules or our precedents requiring us to construe USCCB's response filing in this way, we decline to do so.

Turning to the substance of USCCB's defense, we agree with the district court that it lacked personal jurisdiction over USCCB.

In order to demonstrate personal jurisdiction over USCCB, Means must satisfy the requirements of constitutional due process as set forth in the three-prong test of *Southern Machine Co. v. Mohasco Industries, Inc.*:[4]

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968). Where, as here, the district court decides the personal jurisdiction issue on the basis of written submissions without an evidentiary hearing, the plaintiff must make only a prima facie showing that personal jurisdiction exists. *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012).

*Southern Machine*'s first prong, "purposeful availment," is "'essential' to a finding of personal jurisdiction." *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005). "'Purposeful availment' . . . is present where the defendant's contacts with the forum state

---

[4] As the district court noted, Michigan's long-arm statute extends to the limits of constitutional due process. *See Means v. U.S. Conference of Catholic Bishops*, No. 1:15-CV-353, 2015 WL 3970046, at *4 (W.D. Mich. June 30, 2015) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992); *Green v. Wilson*, 565 N.W.2d 813, 816–17 (Mich. 1997)).

'proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum state . . . .'" *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "[T]he defendant's conduct and connection with the forum" must be "such that he 'should reasonably anticipate being haled into court there.'" *Id.* (quoting *Burger King Corp.*, 471 U.S. at 474). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) (quoting *Burger King Corp.*, 471 U.S. at 475).

USCCB's action of publishing the Directives does not "create a substantial connection" between USCCB and Michigan. Michigan—like every state—does have Catholic hospitals, and USCCB does intend the Directives to be implemented by all Catholic healthcare institutions.[5] USCCB may even have known that Trinity Health is a Catholic hospital network operating in Michigan. But this is not a "substantial connection" such that USCCB would reasonably expect to be haled into court in the state of Michigan. *Cf. Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (holding that a libelous article published in Florida established personal jurisdiction in California because it was about a California resident and was drawn from California sources).

Rather, USCCB is connected to Michigan through exactly the sort of "attenuated contacts" that do *not* permit the exercise of personal jurisdiction. The actions that connect USCCB to Michigan are the actions of CHM (in adopting the Directives in the state of Michigan), of Trinity Health (in operating Catholic hospitals in the state of Michigan), and of Mercy Health (in being a Catholic hospital in the state of Michigan). USCCB has not required Trinity Health or Mercy Health to affiliate with the Catholic Church. Nor did USCCB impose the Directives on Mercy Health. USCCB has simply set forth the ethical standards necessary for an institution to call itself "Catholic." Accordingly, USCCB's connection to Michigan is too attenuated to create personal jurisdiction in a Michigan court. *See, e.g.*, *Calphalon Corp.*,

---

[5]The Directives specifically require "Catholic health care services [to] adopt the[] Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel."

No. 15-1779 *Means v. U.S. Conf. of Catholic Bishops, et al.* Page 8

228 F.3d at 723 (holding that entering into a contract with an Ohio resident did not create personal jurisdiction in Ohio where the contract otherwise had nothing to do with Ohio).

Our decision in *Schneider v. Hardesty* is not to the contrary. 669 F.3d 693 (6th Cir. 2012). In that case, Michael Hardesty, a Utah resident, solicited David Schneider, an Ohio physician, to participate in a medical-malpractice-insurance investment program. *Id.* at 695. Hardesty then invested Schneider's money in a foreign Ponzi scheme. *Id.* Hardesty hired a Utah attorney, Thomas Nelson, to assist in recovering the money. *Id.* at 695–96. Nelson drafted two letters with his own signature block addressed "To Whom it May Concern," which he gave to Hardesty to reassure Hardesty's investors, including Schneider. *Id.* at 696. Nelson did not physically participate in mailing the letters. *Id.* Schneider sued both Hardesty and Nelson in Ohio.

We held that, by writing the letters, Nelson purposely availed himself of the privilege of acting in Ohio. The letters' "false and misleading" representations indicated "intent to establish an ongoing contact." *Id.* at 702. Schneider relied on those representations in Ohio. *Id.* If "Nelson himself mailed the letters to Schneider . . . , there would be 'purposeful availment' to satisfy due process." *Id.* The calculus did not change just because Nelson did not physically mail the letters and may have closed his eyes to their destination.[6] *Id.* at 702–03.

The key in *Schneider* was the "intent to establish . . . *contact*" with specific investors, including the one in Ohio. *Id.* at 702 (emphasis added). USCCB's act of publishing the Directives does not display this type of intent. It may be that USCCB knew that Michigan hospitals would follow the Directives, as USCCB confirms to the IRS the tax-exempt status of Trinity Health. But USCCB did not specifically send the Directives (directly or indirectly) to Trinity Health or even to CHM—rather, it has promulgated the Directives broadly. *Schneider* does not require a finding of personal jurisdiction here.

---

[6]Nelson admitted in his deposition that, although he could not recall whether he was given a complete list of the investors, he was "certainly aware" that Hardesty might distribute the letters he wrote to those investors. 669 F.3d at 696–97. There was no direct evidence that Nelson knew that one of the letters would go to Ohio.

No. 15-1779           *Means v. U.S. Conf. of Catholic Bishops, et al.*           Page 9

Means has not alleged any other connection between USCCB and Michigan, and she has failed to make a prima facie case of personal jurisdiction. We affirm the district court's dismissal of Means's claim against USCCB for lack of personal jurisdiction.

Because no Michigan court has personal jurisdiction over USCCB, the district court erred in transferring that portion of the case to the Western District. *See* 28 U.S.C. §§ 1404, 1406 (permitting a court to transfer venue only to another district where the case could have been brought). As to the CHM defendants, we need not consider whether venue was proper in the Eastern District, because the district court did not abuse its discretion by transferring the case to the Western District of Michigan under § 1404(a).

Section 1404(a) permits a district court to "transfer any civil action to any other district or division" where venue is proper "[f]or the convenience of parties and witnesses, in the interest of justice." Means argues that the district court abused its discretion in balancing the applicable factors in favor of the CHM defendants, arguing that the district court ignored the general rule that, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) (quoting *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir. 1984)).

The district court balanced seven factors in deciding that transfer was appropriate. Five of these—the convenience of the witnesses, the location of operative facts, the ability to compel unwilling witnesses, the interests of justice, and ease of access to sources of proof—weighed strongly or slightly in favor of the Western District. A sixth factor, the convenience of the parties, was neutral. The only factor in Means's favor was the weight accorded to the plaintiff's choice of forum. But, as the district court correctly noted, "where the plaintiff does not reside in the chosen forum[,] courts assign less weight to the plaintiff's choice." *Means v. U.S. Conference of Catholic Bishops*, No. 1:15-CV-353, slip op. at 15 (E.D. Mich. Mar. 31, 2015) (quoting *Audi AG v. Shoken Conchworks, Inc.*, No. 04-70626, 2007 WL 522707, at *2 (E.D. Mich. Feb. 13, 2007)); *see also In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1224 (Fed. Cir. 2011) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)).

The only link to the Eastern District in this case is the decision of CHM to adopt the Directives.  Each of the defendants lives out of state.  Means lives in the Western District.  The hospital, with all of the doctors and nurses and medical records that would be necessary to prove Means's injury, is located in the Western District.  In fact, these non-parties would be outside the reach of the Eastern District's subpoena power.  The court did not abuse its discretion by weighing the balance in favor of transferring the case to the Western District.

Our decision in *Reese* does not require a contrary conclusion.  In *Reese* we affirmed the district court's decision not to transfer venue to the location most convenient to witnesses and where the primary events took place—exactly the opposite of the decision we have before us in this appeal.  Yet we specifically stated that *Reese*'s holding "turn[ed] on the standard of review." 574 F.3d at 320.  In other words, the decision whether or not to transfer fell squarely within the district court's sound discretion.  Even if the decision here could be viewed as equally close, the district court did not abuse its discretion by transferring the case.[7]

### III.  FAILURE TO STATE A CLAIM OF ORDINARY NEGLIGENCE

Having dispensed with the procedural issues before us, we turn to the merits of the CHM defendants' motion to dismiss.  We review de novo the district court's dismissal under Rule 12(b)(6) for failure to state a claim.  *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 832 (6th Cir. 2015).  We accept as true the complaint's factual allegations and construe the complaint in the light most favorable to the plaintiff.  *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 156–57 (6th Cir. 2014).

Means's complaint brought a single cause of action for ordinary negligence against the CHM defendants.  "[I]n order to state a negligence claim on which relief may be granted, [a] plaintiff[] must prove (1) that defendant[s] owed [her] a duty of care, (2) that defendant[s] breached that duty, (3) that [the] plaintiff[] w[as] injured, and (4) that defendant[s'] breach

---

[7]Means also claims that the district court erred by placing on Means the burden of demonstrating proper venue, and by denying her motion for venue discovery.  But the district court actually—and correctly—placed the burden on the defendants.  *See Means v. U.S. Conference of Catholic Bishops*, No. 1:15-CV-353, slip op. at 16 (E.D. Mich. Mar. 31, 2015) (stating that "the Defendants have carried their burden to show that venue should be transferred to the Western District of Michigan" under § 1404(a)).  And the district court was not required to permit venue discovery prior to granting the motion.  *See Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981) (noting that a trial court ruling denying discovery is reviewed for abuse of discretion).

caused [the] plaintiff['s] injuries." *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 688 (Mich. 2005). The district court held that Means's complaint did not state a claim for ordinary negligence because Michigan law does not create a cause of action against healthcare policy makers for "independent negligence" that is distinct from malpractice or vicarious liability.

Means asks us to recognize a duty under Michigan law on the part of a religious organization to a specific patient to adopt ethical directives that do not contradict the medical standard of care. Whether such a duty exists is far from certain, especially if the standard of care violates the organization's religious beliefs. Nevertheless, even if the CHM defendants had such a duty, Means's factual allegations do not create the plausible inference that any breach of that duty proximately caused any injury to Means within the strictures of Michigan negligence law.

In Michigan, "[i]n order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct." *O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 858 (Mich. 2010). The first of these prongs "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id.* (quoting *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)). The second prong "relates to the foreseeability of the consequences." *Id.*

Here, the defendants' actions were the adoption of the USCCB Directives, so we will look to any action the Directives may have caused. To understand what action the Directives may have caused, it is necessary to examine the offending portions. Under Directive 45,

> [a]bortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion . . . .

Counterbalancing this prohibition, Directive 47 permits "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman" and that "cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child." Finally, as relevant here, Directive 27 requires that the patient

> receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

As noted above, the Directives themselves require adoption of the Directives "as policy" in Catholic healthcare institutions.

Means alleges that these Directives dictated Mercy Health's inaction in her situation. In her view, Mercy Health should have: (1) informed Means of the option to terminate her pregnancy before discharging her; (2) informed her of the health risks of continuing her pregnancy; (3) informed her that her baby would likely not survive; and (4) "provide[d] appropriate medical care to" Means. Means alleges that Mercy Health did not do these things because it was following the Directives.

It is not clear that the Directives restricted Mercy Health from giving Means all the information she alleges it withheld. But we will not attempt to interpret the Directives, because even if we were to accept Means's allegations that the Directives dictated Mercy Health's inaction and restriction of information, her complaint suffers from another deficiency.

Means alleges—and we do not doubt—that she suffered physical and mental pain, emotional injuries, a riskier delivery, shock and emotional trauma from making funeral arrangements for her dead child, and other "discomforts and pain." But these allegations are not sufficient to state an injury under Michigan negligence law. In Michigan, "present physical injury" is necessary to state a claim for negligence. *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 691 (Mich. 2005). Pain alone is not "physical injury." *See People v. DeKorte*, 593 N.W.2d 203, 206 (Mich. Ct. App. 1999) (discussing the ordinary meaning of the term "physical injury" by looking to negligence law). Means's allegation of emotional trauma does not cure the problem, because a claim of negligent infliction of emotional distress requires "physical manifestations of that distress." *Henry*, 701 N.W.2d at 692 (emphasis omitted). And although a defendant who causes a miscarriage can be liable for the resulting mental anguish, even when there is no physical injury to the mother, *McClain v. Univ. of Mich. Bd. of Regents*, 665 N.W.2d 484, 496 (Mich. Ct. App. 2003), *superseded by statute on unrelated grounds as noted in Simpson v. Alex Pickens, Jr. & Assocs., MD, PC*, 874 N.W.2d 359, 365 & n.6 (Mich. Ct. App. 2015), here the

defendants—by reason of the Directives—neither caused nor are alleged to have caused the miscarriage.  Means was in labor when she first arrived at the hospital, and while her delivery may have been riskier, she has not alleged any physical consequences.  Nor has she alleged any long-term effects of her bacterial infections.  The complaint does not suggest that Means incurred more medical expenses as a result of Mercy Health's inaction, although even that would be insufficient to state a claim for negligence in Michigan.  *See Henry*, 701 N.W.2d at 690 ("[A] plaintiff must demonstrate a present physical injury to person or property in addition to economic losses that result from that injury in order to recover under a negligence theory.").

Because Means has not alleged that the defendants, by adopting the Directives, caused her any cognizable injury, she has not stated a claim of negligence.  We accordingly AFFIRM the district court's decision dismissing Means's complaint.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 15-1779

TAMESHA MEANS,

        Plaintiff - Appellant,

v.

UNITED STATES CONFERENCE OF CATHOLIC
BISHOPS; STANLEY URBAN; ROBERT
LADENBURGER; MARY MOLLISON,

        Defendants - Appellees.

**FILED**
Sep 08, 2016
DEBORAH S. HUNT, Clerk

Before: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's dismissal of Means's complaint is AFFIRMED.

                           **ENTERED BY ORDER OF THE COURT**

                           Deborah S. Hunt, Clerk